# Richmond.

## ENOCH v. COMMONWEALTH.

January 15, 1925.

1. CONFESSIONS—*Voluntary—Persistent Questioning by Officers—Case at Bar.*—In the instant case, a prosecution for homicide, accused was arrested without a formal warrant, and from eleven o'clock Saturday morning until about one o'clock that night he was practically all of the time under close and constant examination by not less than two police detectives at a time, and he took neither food nor water, although it was offered to him. During this examination accused fainted. After the fainting spell he was carried to the scene of the murder and the questioning continued. He was also taken to the house where the body of the murdered girl lay in her coffin. At one o'clock he was sent to the police station and locked up for the night. On Sunday he was again questioned from about three to six o'clock in the afternoon till a confession was made by him. No warning was at any time given the accused that his statements might be used against him, and his counsel was not present at any of the examinations. He was time and again told that he had committed the offense and was repeatedly urged to tell all about it.

   *Held:* That the confession was not voluntary. While no rewards of a temporal nature were offered to the accused, and no threats of physical violence or additional punishment were made, the confession was obtained under such duress—such "mental terror and physical exhaustion"—as would have avoided a will or a contract made under like circumstances.

2. CONFESSIONS—*Must be Voluntary—When Voluntary—Absence of Threats.*—The voluntariness of a confession is not established merely because it is shown that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by them. But a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise.

3. CONFESSIONS—*Persons in Authority—Police Detectives.*—Police detectives are persons in authority.

4.  CRIMINAL LAW—*Right to Advice and Aid of Counsel—Examination of Accused Prior to Trial—Counsel's Right to Visit Accused in Jail—Case at Bar.*—One of the rights of one accused of crime is to have the advice and aid of counsel. This right of the benefit of counsel exists at all reasonable hours, and certainly while the prisoner is being interrogated by his prosecutors. Counsel for accused is put in a favored class by section 2858 of the Code of 1919, and allowed to visit him in jail while others are excluded. And it is immaterial that no formal warrant for the arrest of accused had been issued, where a felony had been committed and the police had reasonable ground for believing that the accused was the perpetrator and had arrested and were interrogating him.

5.  WITNESSES—*Self Crimination—Section 4778 of the Code of 1919—Where Accused had Testified on the Admissibility of his Alleged Confession.*—In the instant case the Commonwealth was permitted, over the protest of the accused, to call him as a witness to testify for the Commonwealth. The accused had testified before the judge, in the absence of the jury, on the admissibility of an alleged confession, and the Commonwealth claimed that he had thereby waived his privilege of not giving evidence against himself, and was subject to cross-examination as any other witness, under the terms of section 4778 of the Code of 1919.

    *Held:* That accused had not waived his privilege of not giving evidence against himself before the jury by testifying before the judge on the admissibility of his alleged confession.

6.  WITNESSES—*Self Crimination—Section 4778 of the Code of 1919—Where Accused had Testified on the Admissibility of His Alleged Confession.*—Under section 4778 of the Code of 1919, providing that where accused is sworn and examined in his own behalf, he shall be deemed to have waived his privilege of not giving evidence against himself, where accused before the judge, and in the absence of the jury, testified as to the admissibility of his alleged confession, so far as the alleged confession was concerned, having testified in his own behalf, he waived his privilege and became subject to cross-examination as any other witness, but not as to other matters on which he was not examined, such as his guilt or innocence, and upon which he could not have been examined.

7.  STATUTES—*Construction—Looking to the Evil Intended to be Cured.*—In seeking to ascertain the meaning of a statute of doubtful construction, one of the fundamental rules of construction is to look to the evil intended to be cured as well as the remedy provided.

8.  WITNESSES—*Self Crimination—Construction of Section 4778 of the Code of 1919.*—Section 4778 of the Code of 1919, giving accused the right to testify and providing that when he so testifies he shall be deemed to have waived his privilege of not giving evidence against himself, must be given a reasonable construction, and it is not reasonable to

say that an accused can be cross-examined by the Commonwealth on subjects upon which he was not allowed to testify in his own behalf.

9. WITNESSES—*Self Crimination—Constitutional Guaranty—Construction of Statute Giving Right to Testify on Condition of Waiver of Privilege in Favor of Accused.*—The privilege of silence is a constitutional guaranty which cannot be taken away or impaired by legislation. But the State may give its consent for the accused to testify, and may name the terms on which its consent is given. When the State consents, it does so in the interest and for the benefit of the accused, and every qualification of, or condition annexed to, such consent detracts from its value. It would seem, therefore, that the statute giving the accused the right to testify in his own behalf should be liberally construed in favor of the accused, so as to give him the fullest right to testify in his own behalf, and that this right should not be any further impaired than the language of the statute necessarily requires.

10. WITNESSES—*Self Crimination—Section 4778 of the Code of 1919—"In Any Case of Felony."*—The language of section 4778 of the Code of 1919, "in any case of felony" can only mean on the trial of any case of felony, and there can be no trial of a felony case on a plea of not guilty without the presence of a jury.

11. WITNESSES—*Self Crimination—Section 4778 of the Code of 1919—Collateral Matters—Where Accused had Testified on the Admissibility of His Alleged Confession.*—Collateral matters, such as motions for a continuance, the qualifications of jurors, change of venue, or the admissibility of a confession, though incident to the trial by the jury, are questions to be decided by the court. It could never have been intended that the accused should be deemed to have waived his constitutional right of silence before the jury because he had testified to such collateral matters before the judge in the absence of the jury. So far as the merits of the case are concerned, the guilt or innocence of the accused, the accused had not been sworn and examined in his own behalf "in any case of felony." He was sworn and examined on a collateral matter.

12. WITNESSES—*Self Crimination—Section 4778 of the Code of 1919—Where Accused had Testified on the Admissibility of His Alleged Confession.*—Even if the language of the statute (section 4778 of the Code of 1919) warranted the construction that because accused had testified before the judge on the question of the admissibility of an alleged confession he had thereby waived his privilege of not giving evidence against himself before the jury, the court would not place that construction upon it, if a substantial though limited effect could be given to the language of the statute which would be less drastic in its effect, and more just and humane in its operation.

13. Statutes—*Construction—Literal Meaning of Words—Limited Construction.*—As a general rule, where they are explicit, the courts are not at liberty to say that the legislature intended something different from what the language expresses. This general rule is, however, subject to the qualification that if the court is satisfied, the literal meaning of the words would extend the act to cases the legislature never designed to include, it will restrain their operation within narrower limits so as to carry out what was the manifest intention.

14. Statutes—*Construction—Spirit and Reason of the Law.*—A statute should be construed with reference to its spirit and reason; and the courts have power to declare that a case which falls within the letter of the statute is not governed by the statute, because it is not within the spirit and reason of the law and the plain intention of the legislature.

15. Statutes—*Construction—Reasonable Doubt as to Meaning of Criminal Statute—Reasonable Doubt as to Law.*—If there is a reasonable doubt about the construction of a criminal act, the accused is entitled on appeal to the benefit of it, for he is as much entitled, at least in the appellate court, to the benefit of a reasonable doubt about the law as about the facts.

16. Homicide—*Admissibility of Evidence—Lewd Pictures Found in Possession of Accused.*—In a prosecution for murder of a young woman who had first been raped and then murdered, the trial court admitted in evidence over the objection of the accused certain lewd pictures of naked women found on the accused on the day of his arrest.

    *Held:* That the question of the admissibility of these pictures was one resting in the sound discretion of the trial court, and, as its judgment was not plainly wrong, it would not be disturbed.

Error to a judgment of the Hustings Court of the city of Richmond.

*Reversed.*

The opinion states the case.

*Smith & Gordon*, for the plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile, Assistant Attorney General,* and *Lewis H. Machen, Assistant Attorney General,* for the Commonwealth.

Burks, J., delivered the opinion of the court.

Joseph Enoch, the plaintiff in error, was convicted of murder of the first degree, and sentenced to serve a term of twenty years in the penitentiary.   He excepted to several rulings of the trial court, and these exceptions are made the grounds of the assignments of error in this court.

[1]  There was offered in evidence and rejected by the trial court an alleged confession made by the accused. Of course, no exceptions were filed by the accused as the ruling was in his favor, and none by the Commonwealth as it had no right of appeal.   The trial judge, however, requested this court to pass on the admissibility of the confession in the event a new trial was awarded, as a guide for future action, and counsel for the accused and for the Commonwealth have united in the request.

The confession was obtained under substantially the following circumstances:   On Thursday night, April 26, 1923, Celia Shevick, a young girl about sixteen years of age, was murdered in the city of Richmond.   The murder was not discovered till early Friday morning. The police detectives were diligent in their efforts to ascertain who was the murderer.   In consequence of information derived from Mrs. Miller, a young married woman, and her mother, Mrs. Barrett, who live in the neighborhood, they suspected that Joseph Enoch was the guilty party, and arrested him on Saturday morning and brought him to police headquarters about eleven o'clock that day, although no formal warrant for his arrest was sworn out till Sunday night.   Some conversation took place between Enoch and the men who took him into custody at the time of and shortly after his arrest, but that is immaterial to the present enquiry. From eleven o'clock Saturday morning until about one o'clock that night he was practically all of the time

(only slight intermission.) under close and constant examination by not less than two police detectives at a time.   One or two of the witnesses for the Commonwealth state that sometimes there were as many as ten policemen in the room at a time, and that they took it by turns asking him questions.   It clearly appears that this method of questioning was adopted.   About the middle of the day Saturday he was asked particularly if he had not made certain inculpatory statements to Mrs. Miller and Mrs. Barrett and he denied them. Mrs. Miller and Mrs. Barrett were then brought into the room and a colloquy ensued between them on the one hand Enoch on the other, with questions interspersed by the police, and after they retired the police continued their cross-examination.   The questioning continued until eleven o'clock at night when Enoch (who had taken neither food' nor water, although it was offered to him) fainted, and the chief detective "picked him up and put him on the bed and sent for the doctor."   The doctor was promptly on hand.   One or two of the witnesses said that the doctor said he was "faking," but the doctor was not called as a witness, and the chief detective testified: "I didn't believe he was faking" * * "I thought he was human regardless of what he did."   During this examination the bloody clothes of the girl were lying on a table in the room, and one of the detectives picked up a pair of bloomers and held them in front of Enoch and said to him: "You might do a thing of this kind; but wouldn't strike a man."   After the fainting spell about eleven o'clock at night he was given a respite till about eleven forty-five, when he was carried to the scene of the murder and there questioned again, and on this same trip, about twelve o'clock, he was taken to the house where the body of the girl lay in her coffin.   There the lid of

the coffin was removed and he was asked several questions by one or other of the detectives present. This was about 12:30 A. M. He was brought back to headquarters and about one o'clock was sent to the police station and locked up for the night.

To what extent Enoch was questioned Sunday morning is not very clear from the record, but it was stated by Anthony, one of the detectives, that he reported for duty at eight thirty and that he went back twice to talk to him. But from sometime between three and four o'clock in the afternoon till the confession was made, sometime between six and seven, the questioning appears to have been practically continuous. In response to these questions the alleged confession was made to detectives, Anthony and Cousins. The chief of detectives was 'phoned for and gives the following account of what occurred: "Sometime in the afternoon of Sunday I got a 'phone call to come to the first station in which it was said Mr. Enoch had confessed to Anthony and Cousins and probably some of the others; he said Enoch had made a confession.

"Q. Was that in his presence?

"A. I don't think so. He was in the office by himself. So I went in and asked had he made a confession. He said he had. I said did he want to make a statement. He said yes. I said: 'Do you want to make it voluntarily?' He said: 'I want to get it off my mind.' I said: 'You sit right quiet and I will get a notary public here to take it.' I 'phoned to second police station to Squire Gentry, who came down there and the preface of this confession I formulated that myself.

"Q. What part of it did you formulate?

"A. Of my own free will and accord do make the following statement, without hesitation or mental

reservation, without promise of reward or threat of violence to me from anyone." Enoch's statement was then added and the paper signed by him. But there is no copy of the confession in the record. Shortly after the confession was signed Enoch's sisters were permitted to see him for a short time and he was then sent to jail. The chief of detectives was asked: "What was his condition then?" He answered: "Well, I couldn't tell. He was like anybody else would be after what he had gone through. He looked sort of fagged, but he looked kind of relieved." In the same connection he stated: "I think Sergeant Smith picked him up and carried him to the wagon." In another connection he testified as follows:

"Q. Joe was on such a verge of collapse that you said Sergeant Gentry picked him up and carried him to the wagon?"

"A. I don't know what it was. Gentry picked him up and carried him to the wagon."

One of his sisters described his condition as follows:

"His face—he was so weak he looked like he was about to collapse; his face was red as fire and at first he did not recognize me; thought I was somebody else. He looked at me like he was crazy. He looked like he did not know who he was looking at; just thought somebody else was coming to grill him; his eyes just as big as could be. He was just as red and crazy looking. People had come up to him and grilled him until he didn't know what he was doing. He was in a terrible condition."

A disinterested witness testified on the subject as follows:

"What was the condition of Joseph Enoch at that time—physical and mental condition—as far as you could judge?

"A. Well, I don't think I could put it better than I expressed to you. He looked like a crazy man. He was red-eyed, his hair disordered, his clothes pulled around; he was pulling his hair, half laughing, half crying, and seemed to me to be rather hysterical and very much wrought up.

"Q. Did you see them when they took him out of the station house?

"A. Yes.

"Q. Was he or not then in a state of collapse?

"A. He had to be materially assisted out.   *   *   *

"Q. Now, Mr. Taylor, you said something about his being materially assisted out of the police station on Sunday night. Just explain to the judge how they assisted him.

"A. He went out with one policeman on one side and one on the other.

"Q. You mean by his arms?

"A. I don't know whether they toted him. They either toted him or practically toted him.

"Q. They only took him by the arms and took him out this way?

"A. No.

"Q. What did they do?

"A. If they didn't carry his weight he was certainly unable to walk.

"Q. That was after the confession had been made?

"A. Yes."

The persistency with which Enoch was questioned and the object of it is manifest from the following extracts from the testimony of the chief of detectives:

"Q. Now, Captain Wright, you have said frankly that if persistence is a crime you are guilty.

"A. Sure.

"Q. And you were just as persistent to try to get this

boy to admit he was guilty as you possibly could be, without making any promise to him?

"A. I can't say any more so than any other case.

"Q. I say that in this case you were persistent in trying to get an admission from him that he was guilty, without promising him anything?

"A. Yes.

"Q. That is true?

"A. Yes; I reckon so.

"Q. You tried in every fair way that you could to get him to confess it?

"A. Every fair and legitimate way to confess it.

"Q. Every fair and legitimate way to confess it?

"A. Yes.

"Q. And you did try in every fair and legitimate way to get him to confess it from early that morning until he was carried to the first police station?

"A. Well, no. We had him in custody and we were not going to turn him aloose, but really he was more comfortable at headquarters than at the police station and we wanted him to work—we wanted his conscience to work. You keep a man on the edge and you won't get anything from him. Give him a chance to reflect and get himself together.

"Q. That is why you kept him?

"A. In a way; yes.

"Q. To question him?

"A. Yes; from time to time.

"Q. And that was kept up until about one o'clock that night?

"A. Well, probably on different times he had several hours' quiet.

"Q. You weren't only persistent about this matter, but you have got some officers on the force that are just as persistent as you are?

"A. It is our sworn duty.

"Q. They are all as persistent as you are and Sergeant Gentry was just as persistent in trying to get a confession by legitimate means as you were?

"A. I suppose so.   I know of no reason to deny it.

"Q. I am not talking about every time.   I am talking about this particular Saturday, April 28th.

"A. I don't think at any time there were more than three or four officers in there at one time.

"Q. And you said you were as persistent as you could be from the time you got him until you left him to get him to admit that he did it?

"A. Oh, no.   I left him somewhere about one o'clock on Saturday night.   I didn't see him from somewhere about one o'clock Saturday night until six or seven o'clock Sunday evening.

"Q. I am talking about from ten o'clock Saturday until one o'clock Sunday morning.   You were just as persistent as you knew how to be?

"A. Yes; from time to time.

"Q. What would you say to him?   Didn't you tell him half a dozen times, 'You know you are guilty; come on and tell how it happened,' or words to that effect?

"A. I might; words to that effect.

"Q. That is about fair, isn't it?

"A. Sure.

*   *   *   *   *   *   *   *   *   *   *   *

"Q. Now, if he hadn't made a confession that night you would have kept him there all night and the next day, too, wouldn't you?

"A. No, sir; I hadn't interfered with him at all.   I was at home; hadn't even called up.

"Q. Your persistency wasn't going to let it drop there?

"A. Oh, no; it hasn't stopped yet.

"Q. You were going to keep on, weren't you?

"A. Certainly, it was my sworn duty, Mr. Smith.

"Q. To get a confession?

"A. To get a confession if possible.

"Q. Is it your sworn duty to get a confession?

"A. If possible to get it in a legitimate way; yes, sir."

No warning was at any time given the accused that his statements might be used against him, and his counsel was not present at any of the examinations. It is not clear that his counsel was refused permission to be present in this case, but it is clear that the detectives claimed the right to exclude counsel while their client was being examined by them.

Under these circumstances the accused felt compelled to go on the stand and testify as to the treatment he had received at the hands of the police detectives. This need not be detailed further than to say that he testified that he was given no respite by the police; that they took it turn about in squads of two or three at a time; that the bloody clothes of the deceased were shaken in his face; that he was carried to the scene of the murder and also to the dead body of the girl, and asked questions and charged with her murder; that he was not allowed to sleep and that about daybreak Sunday morning they began questioning him again. Finally, Sunday afternoon he was worn out and exhausted and "pretty near dead" and just to get rid of them he began to answer yes to all their questions. He had no recollection of seeing his sisters or of being taken to jail, and seems not to have had any recollection of signing any confession.

The jury were sent out while the examination of witnesses was conducted as to the admissibility of the confession. The examination occupied four days, and the testimony covers about three hundred pages of the printed record. On the completion of the examination, the learned judge of the trial court, amongst other

things, said: "The Bill of Rights, which is now a part of the Constitution of this Commonwealth, provides as follows: 'Nor shall any man be compelled in any criminal proceeding to give evidence against himself.' But it is also a law of this land that the voluntary confessions or admissions of any person accused of crime may be used in evidence against him. The evidence of the police officers as to the manner and methods by which the alleged confession of the accused was obtained reads like a chapter from the history of the inquisition of the Middle Ages. I don't see how anyone with an unbiased mind can hear or read that evidence without coming to the conclusion that the accused was compelled by mental and physical exhaustion to give evidence against himself and that the alleged confession was not a voluntary confession within the meaning of the law. I, therefore, decide that the alleged confession is inadmissible as evidence against the accused."

We cannot say less. Such efforts to extract a confession from the accused do not comport with modern ideas of the administration of justice. The enormity of the offense cannot justify the use of illegal methods of securing a conviction. While no rewards of a temporal nature were offered to the accused, and no threats of physical violence or additional punishment were made, the confession was obtained under such duress—such "mental terror and physical exhaustion"—as would have avoided a will or a contract made under like circumstances. It was not voluntary. This was later admitted by one of the detectives who testified before the jury on the merits of the case. Speaking of Enoch, he testified: "He never was anxious to tell me anything about it, * * * * he did not voluntarily tell me anything."

[2] In the recent case of *Ziang Sung Wan* v. *United States* (October 1924), 45 Sup. Ct. 1, 3, 69 L. Ed. ——, it is said: "In the Federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by them. But a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise. *Bram* v. *United States*, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568."

In this view we concur. The *Bram Case* referred to in the foregoing opinion contains a complete review of all prior cases, English and American, State and Federal, and the majority opinion was delivered by Mr. Justice, afterwards Chief Justice, White.

Our own cases on the subject of confessions give no countenance to the procedure adopted in this case. See *Smith* v. *Comth.*, 10 Gratt. (51 Va.) 734; *Shifflett* v. *Comth.*, 14 Gratt. (55 Va.) 652; *Vaughan* v. *Comth.*, 17 Gratt. (58 Va.) 576; *Mitchell* v. *Comth.*, 33 Gratt. (74 Va.) 845; *Venable* v. *Comth.*, 24 Gratt. (65 Va.) 639; *Early* v. *Comth.*, 86 Va. 928, 11 S. E. 795; *Hite* v. *Comth.*, 96 Va. 489, 31 S. E. 895; *Jackson* v. *Comth.*, 116 Va. 1015, 81 S. E. 192.

In *Vaughan* v. *Comth.*, *supra*, a confession to a special constable was excluded because he said to the accused: "You had as well tell all about it," or as stated in another place, "You had better tell all about it." The court said: "The difference between the two forms of expression is unimportant. One form of expression

was calculated to produce as much effect, and the very same effect, upon the mind of the prisoner as the other." In the instant case the accused was time and again told that he had committed the offense and was repeatedly urged to tell all about it.

[3] It is unnecessary to adduce either argument or authority in support of the proposition that the police detectives were persons in authority.

[4] The police detectives have testified with apparently great candor and fairness and seem to have kept back nothing touching their language or conduct in the investigation of the case. They verily thought they were doing their duty and the State a service in their efforts to secure a confession. But in this they were in error. The Commonwealth does not seek vengeance, but to do justice between itself and its citizens, and one of the rights of the citizen is to have the advice and aid of counsel. In *Hill* v. *Comth.*, 88 Va., 633 at page 639, 14 S. E. 330, 332, 29 Am. St. Rep. 744, this right is classed with the constitutional right "to call for evidence in his favor." It is there said that the accused "is entitled under the fundamental law of the State to process to compel the attendance of witnesses, and to the benefit of counsel." This right of the benefit of counsel exists at all reasonable hours, and certainly while the prisoner is being interrogated by his prosecutors. The right might be of little benefit if it were otherwise. The police detectives were jailers of the accused and had no right to deny his counsel the opportunity to be present when he was being questioned by any. "The counsel of the prisoner" is put in a favored class by section 2858 of the Code, and allowed to visit him in jail while others are excluded.*

---

*The following testimony shows the attitude of the detectives towards counsel for the accused:

It is immaterial that no formal warrant for the arrest of the accused was issued or formal arrest made till Sunday night, although he was taken into custody on Saturday morning.    A felony had been committed and the police had reasonable ground for believing that the accused was the perpetrator.    This subject is fully discussed in *Hill* v. *Smith*, 107 Va. 848, 59 S. E. 475, and the discussion need not be repeated.

The trial court committed no error in excluding the confession.

[5] This brings us to a discussion of the assignments of error, the first of which is that the Commonwealth was permitted, over the protest of the prisoner, to call him as a witness to testify for the Commonwealth.   The accused had testified before the judge, in the absence of the jury, on the admissibility of his alleged confession, and the Commonwealth claimed that he had thereby waived his privilege of not giving evidence against himself and was subject to cross-examination as any other

"Q. And you know that counsel, the man's own counsel, had been refused admittance in there, don't you, when you questioned them?

"Mr. Satterfield:    Objection.

"The court:    Objection overruled.

"Q. I say you know that to be a fact; that I myself have been refused admission in that room when you all were cross-examining my client?

"Mr. Satterfield:    Objection.

"The court:    I have ruled that question is admissible.

"Q. What do you say about that?    You know that to be a fact?

"A. Yes, sir.

"Q. You say that is true?

"A. Yes, sir.

"Q. That you refused to let me come in there?

"A. Yes, sir.

"Q. And I was the man's counsel?

"A. I don't know about that, whether you were counsel or not.

"Q. You heard me say I was counsel, didn't you?

"A. You might have said it.    I don't doubt it.

          *          *          *          *          *          *          *          *

"Q. So it is your contention, is it not, that you have a right to cross-examine witnesses who are not under arrest and to refuse their counsel admission in the room while you are cross-examining them?

"A. That is two questions you are asking me.    I have been heretofore

witness, under the terms of section 4778 of the Code. This section is as follows:

"Section 4778—Right of Accused to Testify—In any case of felony ·or misdemeanor the accused may be sworn and examined in his own behalf, and if so sworn and examined, he shall 'be deemed to have waived his privilege of not giving evidence against himself, and shall be subject to cross-examination as any other witness; but his failure to testify shall create no presumption against him, nor be the subject of any comment before the court or jury by the prosecuting attorney."

The statute removing the disqualification of interest in civil cases was enacted in February, 1867, Acts 1866-7, page 615 (now 6208 of the Code), while the statute permitting an accused person to testify in his own behalf was not enacted until January 21, 1886 (Acts 1885-6, page 31, now section 4778 of the Code). The latter statute remained as enacted till the revision of 1919, when the revisors inserted the words "and if so sworn and examined he shall be deemed to have waived his privilege of not giving evidence against himself."

arresting a person and taking him into that room to see if we can get something out of him.   We did take him in there for an investigation to find whether there is anything to it.

"Q. You all took French and Ganzert in that room after Mr. Wendenburg and I had appeared for them before the coroner's inquest and the police court and took them over there and cross-examined them and refused me admission?

"A. Mr. Smith:   I couldn't say whether it was after that case.

"Q. You know it was after the coroner's inquest, don't you?

"A. I think I was on my vacation at that time, but I recall the time you came there for admission when he was in the room.

"Q. You were there, weren't you, in that room?

"A. I remember the time that you came there.

"Q. And knocked at the door?

"A. Yes, I was there at that time.

"Q. And asked Captain Wright if French and Ganzert were in there?

"A. Yes, sir.

"Q. And that I asked permission to come in and hear what was going on and I was very impolitely treated and told I could go somewhere else and make my complaint?

"Q. That it didn't make any impression on headquarters?

"A. Yes, you were told you could go somewhere else and that is about the truth of it."

The reason for the insertion was to avoid a doubtful construction of the language of the original statute as appears from the following note of the revisors appended to that section:

Revisors' Note.    "Under this section as it stood before the revision, some doubt was expressed as to the meaning of the phrase 'subject to cross-examination as any other witness.'    This doubt was as to whether the accused waives his privilege of not testifying against himself and may stop at any stage when a question is asked which would tend to incriminate him.    While the revisors did not concur in this doubt, they thought it well to put the language of the section in such form as would settle the question, expressly declaring that if the accused be 'so sworn and examined he shall be deemed to have waived his privilege of not giving evidence against himself.' "

The revisors did not extend the class of cases in which the right of cross-examination was given, but simply defined the extent of the right where it already existed. If the right to cross-examine did not exist before, it was not conferred by the revision.

The constitutional right of silence was not, nor could it have been taken away by the statute.    Nor did the statute attempt to confer upon the Commonwealth the right to *examine* the accused, but only to *cross-examine* him under given conditions.    This right to cross-examine, however, could only exist where there had been a prior examination in chief.    It could not have been the intention of the legislature to permit the cross-examination of the accused touching a matter upon which he could not be examined in chief, and before a tribunal which could not hear testimony on the subject.    When before the judge on the subject of the admissibility of the confession, the accused could not testify as to the

*corpus delicti* or as to his guilt or innocence, but only as to the circumstances under which the alleged confession was made.    Other matters were collateral to the issue before the judge, and he was without jurisdiction to hear evidence on the subject.

[6, 7] So far as the alleged confession was concerned, having testified in his own behalf, he waived his privilege and became subject to cross-examination as any other witness.    He paid this penalty by submitting to a very rigid and extended cross-examination on this subject.    So far as he sought an advantage from his own testimony, he was subjected to the penalty imposed therefor by statute, and it cannot be supposed that the legislature intended to go further.    In seeking to ascertain the meaning of a statute of doubtful construction, one of the fundamental rules of construction is that we shall look to the evil intended to be cured as well as the remedy provided.

In the instant case the legislature manifestly thought that an injustice was being done the accused in not allowing him to testify in his own behalf, and to cure this evil the statute was passed to enable him to testify, and then, to guard against false testimony, the right of cross-examination was conferred.    It would seem that this safeguard did not extend any further than the benefit conferred, and that if the benefit was limited the safeguard should be also.

In the instant case the alleged confession was excluded on the statement of the officers themselves, but if it had been testified to by only a single witness for the Commonwealth, and he had made out a *prima facie* case, the accused would have been in the position where he would have been compelled to have submitted to a conviction on such confession, or else go on the stand and deny it. If he had done the latter, although he could

not then have testified to his guilt or innocence on this preliminary enquiry, to subject him to cross-examination on the merits would have been to compel him to testify against himself. It cannot be that the legislature ever intended to lay such a trap for the accused, especially when the Commonwealth is amply protected by the provisions of section 4781* of the Code. Under this section all statements made by the accused "when examined as a witness in his own behalf" at the hearing on the admissibility of the confession were provable against him at the trial on the merits, and there could be no good reason for the right to cross-examine contended for.

[8] The trial court, as we have seen, properly excluded the confession, and it also properly excluded questions and answers "so closely mixed up with the alleged confession that it is impossible to segregate them," and yet allowed him to be fully examined on all other questions in the case. This exclusion of itself demonstrates that there could not be the unlimited cross-examination which it is claimed the statute confers. The statute must have a reasonable construction, and it is not reasonable to say that an accused can be cross-examined by the Commonwealth on subjects upon which he was not allowed to testify in his own behalf.

[9] The privilege of silence is a constitutional guaranty which cannot be taken away or impaired by legislation. But the State may give its consent for the accused to testify, and may name the terms on which its consent is given. When the State consents it does so in

---

*Section 4781. When Statement by Accused as a Witness not Received as Evidence.—In a criminal prosecution, other than for perjury, or in an action on a penal statute, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination, unless such statement was made when examined as a witness in his own behalf.

(This section was amended, Acts 1924, page 637, but the amendment does not affect the instant case.)

the interest and for the benefit of the accused, and every qualification of, or condition annexed to, such consent detracts from its value.   It would seem, therefore, that the statute giving the accused the right to testify in his own behalf should be liberally construed in favor of the accused, so as to give him the fullest right to testify in his own behalf, and that this right should not be any further impaired than the language of the statute necessarily requires.

It was long doubted whether such statutes were beneficial to the accused, and none was passed in England until 1898, nor in this State until 1886.   We know from the history of these statutes that they were passed to enable the accused to testify as to his guilt or innocence before the tribunal which was to determine that question.   It is only when he seeks to get some advantage from his testimony that the condition is imposed by the statute.   In the instant case, when the accused offered himself as a witness before the court on the subject of the confession, he waived his immunity and was subject to cross-examination as any other witness on that subject and before that tribunal.   On this examination could he have been asked: "Did you kill this girl?" Manifestly not, for the court had no jurisdiction to pronounce on his guilt or innocence. The cross-examination was limited to the scope of the examination-in-chief, and the question at issue before the court.

So, on the other hand, in the examination before the jury, they had nothing to do with the confession.   Their sole duty was to determine the issue of the guilt or innocence of the accused.   They knew that the Commonwealth claimed that there had been a confession, but why it was excluded they did not know, and they were ignorant of the fact that the accused had testified on the subject. The confession was a matter wholly collateral to

the issue before them.   They had nothing to do with it and they knew nothing about it.   So far as the jury knew, the accused had never left his seat at the bar, and yet was called by the State, not for cross-examination, but for examination-in-chief against himself.   As to the issue to be tried by the *jury*, he had never been "sworn and examined in his own behalf," and until this was done, he was not subject to cross-examination, nor any other kind of examination by the State.

It seems inconceivable that the legislature ever intended that a prisoner who had never opened his mouth before the jury, who never gave them his version of the case they were trying, who never asked them to believe one word he had ever uttered, intended to give the State the right to put him on the stand, simply because at a former day he had testified before the judge as to treatment he had received at the hands of officers of the law while he was their prisoner.   These matters had nothing to do with the innocence or guilt of the accused. They were wholly collateral to the main issue.   Not until the accused testified to something at least relevant to his guilt or innocence could it be said that he had been "sworn and examined in his own behalf."   He did not do this even before the judge.

[10-13] The language of the statute, "in any case of felony," can only mean "on the trial of any case of felony."   Now, there can be no trial of a felony case on a plea of "not guilty" without the presence of a jury. It alone can decide whether the accused is guilty or not guilty, and when the statute speaks of "any case of felony" it has reference to a trial before that tribunal which has the power and jurisdiction to hear and determine the questions rightfully submitted to it.   The jury can only *hear* such evidence as the court determines is admissible, and it can only *decide* the question of the

guilt or innocense of the accused.   So far as the jury is concerned there is no trial of a felony before it except upon the evidence admitted by the court.   Collateral matters, such as motions for a continuance, the qualifications of jurors, change of venue, or the admissibility of a confession, though incident to the trial by the jury, are questions to be decided by the court.   It could never have been intended that the accused should be deemed to have waived his constitutional right of silence before the jury because he had testified to such collateral matters before the judge in the absence of the jury.   So far as the merits of the case are concerned, the guilt or innocence of the accused, the accused had not been sworn and examined in his own behalf "in any case of felony."   He was sworn and examined on a collateral matter—a matter as collateral as the qualifications of an expert to testify, or any other illegal methods by which evidence has been acquired.

But even if the language of the statute warrants the construction contended for by the Commonwealth, this court would not place that construction upon it, if a substantial, though limited, effect could be given to the language of the statute which would be less drastic in its effect, and more just and humane in its operation.

In *Grubb's Adm'r* v. *Sult*, 32 Gratt. (72 Va.) 203, 208, 34 Am. Rep. 765, it is said:   "It will be universally conceded that, in the interpretation of the statute, the leading idea is to find out the intention of the legislature. In ascertaining that intention, we must, of course, look at the terms used.   As a general rule, where they are explicit, the courts are not at liberty to say that the legislature intended something different from what the language expresses.   This general rule is, however, subject to the qualification that if the court is satisfied that the literal meaning of the words would extend the act to

cases the legislature never designed to include, it will restrain their operation within narrower limits so as to carry out what was the manifest intention. *Brewer* v. *Blougher*, 14 Peters R. 178."

In *State* v. *Myers*, 74 W. Va. 488, 491, 82 S. E. 270, 272, it is said: "The real purpose and intention of the legislature is the guiding star in the construction of statutes, and it is sometimes necessary to extend the meaning of the statute to things not strictly within its letter and to exclude from its operation things which do fall within its letter, in order to arrive at the true intention of the law makers. *Brown* v. *Gates*, 15 W. Va. 131; *Railway* v. *Conley*, 67 W. Va. 129, 67 S. E. 613; and *Grubbs' Adm'r* v. *Sult*, 32 Grat. (73 Va.) 203, 34 Am. Rep. 765."

In *Bank of Weston* v. *Thomas*, 75 W. Va. 321, 83 S. E. 985, it was held that "the rule of construction, requiring effect to be given to all the terms used in a statute, if possible, is satisfied by assignment to them of a substantial, though limited, function or field of operation. It does not require allowance to them of a scope of operation coextensive with their literal import."

*Holy Trinity Church* v. *United States*, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226, it is said in the opinion, was "a case where there was presented a definite evil, in view of which the legislature used general terms with the purpose of *reaching all phases of that evil*, and thereafter, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against." Upon this state of facts, the court said: "It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, *though within the letter*, is not within the intention of

the legislature, and therefore cannot be within the statute." (Italics supplied.)

In *Harris* v. *Commonwealth*, 81 Va. 240, 29 Am. Rep. 666, cited with approval by that careful and painstaking judge, Buchanan, in *Kloss* v. *Commonwealth*, 103 Va. 864, 868, 49 S. E. 655, it is said: "No man incurs a penalty unless the act which subjects him to it is clearly within the spirit and the letter of the statute imposing the penalty."

In *Sutherland* v. *Commonwealth*, 109 Va. 834, 835, 65 S. E. 15, 23 L. R. A. (N. S.) 172, 132 Am. St. Rep. 949, it is said: "No man incurs a penalty unless the act which subjects him to it is clearly within the spirit and letter of the statute which imposes the penalty. There can be no constructive offenses, and before a man is punished his case must be plainly and unmistakably within the statute. If these principles are violated, the fate of the accused is determined by the arbitrary discretion of the judges and not by the express authority of the law. *Harris* v. *Com'th*, 81 Va. 240, 59 Am. Rep. 666; *Lascallett* v. *Com'th*, 89 Va. 878, 17 S. E. 546; *United States* v. *Wiltberger*, 5 Wheat. 76, 5 L. Ed. 37." See also *Withers* v. *Com'th*, 109 Va. 837, 65 S. E. 16.

[14] In Black on Interpretation of Laws 48, many cases are cited in support of the following statement of the text: "A statute should be construed with reference to its spirit and reason; and the courts have power to declare that a case which falls within the letter of the statute is not governed by the statute, because it is not within the spirit and reason of the law and the plain intention of the legislature."

The Commonwealth is so fully protected by the provisions of section 4781 of the Code that there could be no reason for so harsh a construction of section 4778 as is contended for, even if the language of the latter sec-

tion is susceptible of that construction, but the object of the statute was to prevent the accused from getting the advantage of his own testimony without subjecting himself to cross-examination.    In the instant case, the only advantage gotten by the accused was his testimony on a collateral matter, before the judge, in the absence of the jury, where he was fully cross-examined.    The right now to call him to testify against himself before the jury is certainly not within the spirit of the statute, if it can be said to be within its letter.

[15] If there is a reasonable doubt about this construction of the statute, the accused is entitled on appeal to the benefit of it, for he is as much entitled, at least in this court, to the benefit of a reasonable doubt about the law as about the facts.

In *Rand* v. *Commonwealth*, 9 Gratt. (50 Va.) 738, 742, it is said:    "If a reasonable doubt arose out of the language used in the statute, whether the law contemplated the cases in which the first construction was had before its passage, the charitable rules which prevail in the construction of such laws would perhaps require us to restrict its operation to those cases alone where the first conviction had taken place since the passage of the law.

There were cited for the Commonwealth the following cases:    *Commonwealth* v. *Tolliver*, 119 Mass. 315; *Harrold* v. *Territory of Oklahoma*, 10 Okla. 395; *Shephard* v. *State*, 88 Wis. 186; and *Thaniel* v. *Com'th*, 132 Va. 795, 111 S. E. 259.    The first two of these cases are reviewed in the *Thaniel Case*, but none of them has been very helpful in the interpretation of our statute, and they were all cases where the accused voluntarily testified in his own behalf before the jury.    Moreover, it is admitted in the brief for the Commonwealth that the cases cited are not in point, for it is there said: "So far as we are ad-

vised, and our search has been diligent, no other cases presenting similar facts to those involved in this assignment of error has been passed upon by an appellate court."

The trial court erred in forcing the accused to go upon the stand and testify under the circumstances narrated.

[16] The next assignment of error is because of the admission in evidence, over the objection of the accused, of certain lewd pictures of naked women found on the accused on the day of the arrest.

The trial court dealt with this subject as follows:

"The next exception as stated in the record was: 'Admission of evidence objected to, and particularly the pictures taken from Enoch.'

"In the argument of this motion for a new trial no objection was made to any evidence admitted by the court except to the admission of three or four lewd and indecent photographs of nude women which were found in the pocket of the accused at the time of his arrest.

"The evidence in the case proved conclusively that the deceased, a young white female about sixteen years of age, had been raped, and *struck* on the head with some blunt instrument, and left all night in a lonely spot in a dying condition, and that she subsequently died of the wounds so inflicted.

"There can be no doubt that the primary object of the attack upon the deceased was to gratify sexual passions, and that the perpetrator of the crime committed murder either because of the resistance of the deceased or to cover up his crime of rape.

"Any evidence which tends to show the motive or intent with which a criminal act was committed is admissible as evidence. These lewd photographs which, as above stated, were taken from the pocket of the accused at the time of his arrest were calculated to inflame the

sexual passions of a man, and were allowed in evidence as tending to show the state of mind of the accused and the motive for the commission of the double crime of rape and murder."

Much may be said on both sides of this question, and it is not probable that the courts would agree on its proper solution. But the trial court had before it all of the testimony on the subject of when, where and of whom the pictures were obtained, the use made of them, and the whole setting of the case, and was in much better condition to determine whether their introduction would cause undue prejudice against the accused than this court can be. The question of their admissibility was one resting in the sound discretion of the trial court, and, as its judgment is not plainly wrong, it will not be disturbed. *Karnes* v. *Com'th*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509.

In 1 Wigmore on Evidence, section 238, it is said:

"The kinds of conduct which may evidence a design are innumerable in their variety. Any act, which under the circumstances and according to experience as naturally interpreted and applied would indicate a probable design, is relevant and admissible. It is true that the design indicated may be too indefinite to be itself irrelevant as evidence of an act (*ante*, section 106); but this does not affect the relevancy of the conduct to evidence that design. Most evidence of this sort needs no judicial ruling to determine its relevancy, and the precedents deal with only a limited number of the possible uses of such evidence. The discretion of the trial court should control in all these cases; it is impossible to lay down any general rule that will be definite enough to serve as a solution for each instance; and it is poor policy to attempt in a Supreme Court to pass upon the probative value of each given piece of conduct. Any attempt to reconcile all of the rulings is hopeless; there is no rea-

son why they should be treated as binding precedents
*   *   *   *.' '

The last assignment of error is because the trial court refused to set aside the verdict of the jury as contrary to the law and the evidence.    As the case must be remanded for a new trial, we express no opinion upon the weight of the evidence.

For the error hereinbefore pointed out, the judgment of the trial court will be reversed, the verdict of the jury set aside, and the case remanded for a new trial in accord with this opinion.

*Reversed.*

SIMS, P., concurs in the majority opinion, except in what is said therein upon the subject of the first assignment of error, with respect to the proper construction of section 4778 of the Code, and, upon that subject, concurs in the result of the majority opinion.

PRENTIS, J., dissenting:

My views as to the proper construction of Code section 4778 differ so radically from those expressed by my brethren that I feel impelled to record my dissent therefrom.    To me the words of the statute permitting one accused of crime to testify in his own behalf upon condition that he waive his privilege to stand mute are too clear to need any interpretation, and the sound progressive public policy of the act is too manifest to justify any qualification of its language.    The impelling motive and sufficient reason for the statute are the improvement of the administration of the criminal law, so that the vindication of the innocent may be easier and the conviction of the guilty more certain.    Being a remedial statute then, I think that it should not receive a construction so strict as to limit its operation, for this tends to defeat instead of to effect its purpose.