## CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

    v.

Lawrence Elie Meggison

April 15, 1988

Case No. 872021F08

### By JUDGE LEONARD B. SACHS

This seventeen year old defendant has moved to suppress the cocaine taken from him by two Norfolk detectives at the Norfolk Airport after he arrived from New York on the 23rd day of June, 1987. Meggison states that the search of his personal effects was unconstitutionally defective.

After a review of the law and the evidence and the arguments of counsel, I must regretfully agree. Regretfully, I say regretfully, because it is very hard to set aside in one's mind that he was in possession of twelve ounces of cocaine when he was arrested.

A random stop in a public place for interrogation is not lawful in Virginia absent a finding that the policeman:

> reasonably suspects that [the person stopped] is committing, has committed, or is about to commit a felony or possesses a concealed weapon in violation of § 18.2-308 and may require of such person his name and address. . . .

Further, the policeman can search the detainee for a weapon *only* if he "reasonably believes that such person *intends* to do him harm. . . ." (§ 19.2-83 Code of Virginia) (Emphasis mine)

Notwithstanding that this is a penal statute and must therefore be narrowly construed it is not necessary to do so in this case as the statute uses simple English words, the meaning of which are clear and unambiguous to conclude as we do that the search of the defendant Meggison was statutorily and constitutionally flawed and that the contraband seized in the search must be suppressed.

In *Simmons v. Commonwealth*, 217 Va. 552 (1977), the Virginia Supreme Court held that § 19.2-83 "is more stringent than the language of *Terry*. . . ." (*Terry v. Ohio*, 392 U.S. 1 (1968).

Section 19.2-83 was enacted after the decision in *Terry*. *Terry* merely defined the outer limits to which, under the United States Constitution a police officer might approach, inquire of, and "search" a person without the traditional requirements of probable cause and/or a warrant.

As the Supreme Court of Virginia pointed out in *Simmons*, police officers in Virginia are held to a stricter standard.

The legislature is presumed to have known and understood the limits of the law as set forth in Terry when they set down the more stringent and limited permission for such stops in § 19.2-83. *See Lillard v. Fairfax County Airport Authority*, 208 Va. 8 (1967).

It has always been the law and is still the law in construing legislation that:

> "it will be universally conceded that, in the interpretation of the statute, the leading idea is to find out the intention of the legislature. In ascertaining that intention, we must, of course, look to the terms used. As a general rule, where they are explicit, the courts are not at liberty to say that the legislature intended something different from what the language expresses." *Enoch v. Commonwealth*, 141 Va. 411 (1925), quoting with approval from *Grubb's Adm'r v. Sult*, 72 Va. (32 Gratt.) 203, 208, at page 433 of 141 Va.

The Enoch case also stands for the proposition that

you must consider what the legislature intended in enacting the legislation under review.

It seems clear to the court that the legislature had Terry in mind when they enacted § 19.2-83 and chose to limit the authority of police officers in cases where there is no probable cause or warrant.

When critically analyzed the critical standards of Section 19.2-83 imposed by the legislature have not been met in this case.

First, the policeman must "reasonably believe" that the suspect "has committed or is about to commit a felony."

The crucial word is "reasonably," which is to say that his suspicion is based on "reason." "Reason" requires facts. Mere suspicion is not enough. Our Supreme Court has quoted with approval the language of *Terry, supra,* that there must be "specific," and articulable facts which, taken together with rational inferences from those facts reasonably warrant[ed] [the] intrusion." *Lansdown v. Commonwealth,* 226 Va. 204 at 212 (1983).

The language of § 19.2-83 is simple and direct. No one can be stopped without reasonable suspicion and then the police, according to the statute can ask the defendant only "his name and address."

Neither *Terry* nor § 19.2-83 permits a search for contraband without probable cause or warrant.

*Terry* permits a search only for the protection of the officer who is permitted to determine if the detainee is armed. Section 19.2-83 sets even more stringent standards for Virginia police officers who wish to search a detainee for a weapon than does *Terry.*

There was a total lack of such facts in this case. Even if there were facts that would have "warranted the intrusion" § 19.2-83 limits the inquiry to obtaining the detainee's "name and address." At the hearing on this case on October 15, 1987, Investigator Killmon stated that he saw the defendant "deplane" from Flight 18, a Piedmont flight from La Guardia. (T.12) He was wearing baggy blue jeans, a red T-shirt and a "multi-colored crush type hat." (T.13) He was carrying only a brown plastic bag with handles that had been knotted and then looped over his wrist. (T.13) He walked at a fast pace toward the lobby without looking right or left, or backward. *There was no eye contact.* He did not stop to look around. He did not make any phone

calls from the phones in the corridor leading to the lobby, all of which seem to be usually cited in these cases as conduct which arouses suspicion on the part of the police.

Killmon and his partner followed Meggison through the lobby and down the escalator to the departure side and onto the sidewalk on the opposite side where you would "normally pick up luggage." There is a short-term parking lot outside those doors and a sidewalk leading to the long-term parking lot at the old terminal as well as a sidewalk leading directly to the long-term parking garage, and the Court takes judicial notice of these facts.

The police positioned themselves near the defendant on the sidewalk and asked him if they could talk to him. After they showed their badges and their DEA I.D. cards he agreed.

The first thing Investigator Killmon asked Meggison was "if I could see his airline ticket." (T.15, 16)

The defendant produced a one-way ticket in the name of "Wilmer Sanders" which "had been paid for in cash." Killmon noted those things and returned the ticket to the defendant (T.16) and then asked for I.D. Defendant said he had none. (T.16) Then Killmon conducted a rather thorough investigation.

BY MRS. MARX:

Q. Did you ask him anything else?

A. Yes, I did. I asked him if he had any identification, and he stated that he didn't. And I then asked him how long he was going to be in town. He replied "about a week or so." It struck me as unusual all that he had was his bag and he was going to be gone for a week or so. I said "are you going to stay here for that long? You don't have any luggage." To that he replied he had some shorts over to his brother's house. I then asked him what his brother's name was and he said "Kevin." I said "Kevin Sanders"? And he said, "no, Kevin Howell." Then he said that he goes to Norfolk State. I said where does your brother live, and he said Flowerfield Road, which I thought

that was unusual also. Flowerfield Field Road
is a block off of Little Creek Road. Norfolk
State is all the way down in the downtown area,
quite a distance to travel every day.

Thus far the police had not patted down the defendant
for any weapon. Killmon asked him if he would cooperate
with them to "stem the flow of drugs coming through the
Norfolk Airport," and "asked him if he would mind if we
searched the bag and patted him down and he said "yeah
sure." (T.17)
Killmon then stated that:

> When he said that, he held out his right hand
> that had had the bag on it and then he had
> let go of it and was dangling the straps that
> were wrapped around his wrist. I moved it from
> his wrist and untied the knot and I noticed
> as I was untying the knots, I looked up at
> him, his eyes had grown quite large like he
> was scared.
> I opened the bag and I reached inside
> and pulled out a tennis shoe. I looked inside
> the tennis shoe. It was nothing unusual about
> it. I stuck it under my arm and went into the
> bag again and I saw an object in it that was
> about the size of a softball. It was round
> and a light color. I pulled it out and it was
> a white powdery chunky substance which I believed
> at the time to be cocaine.
> I then advised Mr. Meggison that he was
> under arrest for possession of narcotics. Corporal
> McNett placed him in a search position on the
> wall and searched him. I advised him of his
> rights under *Miranda* and when I completed that
> I asked him if he understood his rights and
> he indicated that he did.

At no time did the police act as if they were concerned
or suggest that they were concerned that, as suggested
in *Terry*, they were concerned for their personal safety
or as set out in § 19.2-83 that the defendant "intend[ed]
to do him [Killmon] harm."

From the beginning to end it is clear that the officers had no reasonable articulable suspicions based on facts. They had only mere suspicion. That is insufficient under both § 19.2-83 and *Terry*, to "warrant the intrusion" i.e. the stop. Thereafter, the interrogation exceeded the limits permitted by § 19.2-83 and probably *Terry*. cf. *Zimmerman v. Commonwealth*, 234 Va. 609 (1988).

Finally, the search was for contraband, not a weapon and was therefore an illegal search under provisions of Section 19.2-83 and *Terry*. Being a warrantless search without probable cause, and a search which did not fit the criteria set forth in § 19.2-83 or *Terry* it was made in violation of the Virginia Constitution, as well as the Fourth Amendment of the U. S. Constitution subsumed in the Fourteenth Amendment and § 19.2-83 of the Code of Virginia.

For any or all of these reasons, the search was illegal and the cocaine which was the product of that search cannot be used in evidence against the defendant and is therefore suppressed, and an order to that effect will be entered so holding. For the reasons set forth it has not been necessary to discuss or decide the issue of the defendant's minority as it would bear on the validity of his consent without the presence of parent or guardian to assist him.