## ASHCRAFT ET AL. *v.* TENNESSEE.

No. 391.   Argued February 28, 1944.—Decided May 1, 1944.

---

[6] *Id.,* cases cited p. 556.

*Messrs. James F. Bickers* and *Grover N. McCormick* for petitioners.

*Mr. Nat Tipton*, with whom *Mr. Roy H. Beeler*, Attorney General of Tennessee, was on the brief, for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

About three o'clock on the morning of Thursday, June 5, 1941, Mrs. Zelma Ida Ashcraft got in her automobile at her home in Memphis, Tennessee, and set out on a trip to visit her mother's home in Kentucky. Late in the afternoon of the same day, her car was observed a few miles out of Memphis, standing on the wrong side of a road which she would likely have taken on her journey. Just off the road, in a slough, her lifeless body was found. On her head were cut places inflicted by blows sufficient to have caused her death. Petitioner Ware, age 20, a Negro, was indicted in a state court and found guilty of her murder. Petitioner Ashcraft, age 45, a white man, husband of the deceased, charged with having hired Ware to commit the murder, was tried jointly with Ware and convicted as an accessory before the fact. Both were sentenced to ninety-nine years in the state peniten-

tiary. The Supreme Court of Tennessee affirmed the convictions.

In applying to us for certiorari, Ware and Ashcraft urged that alleged confessions were used at their trial which had been extorted from them by state law enforcement officers in violation of the Fourteenth Amendment, and that "solely and alone" on the basis of these confessions they had been convicted. Their contentions raised a federal question which the record showed to be substantial and we brought both cases here for review. Upon oral argument before this Court Tennessee's legal representatives conceded that the convictions could not be sustained without the confessions but defended their use upon the ground that they were not compelled but were "freely and voluntarily made."

The record discloses that neither the trial court nor the Tennessee Supreme Court actually held as a matter of fact that petitioners' confessions were "freely and voluntarily made." The trial court heard evidence on the issue out of the jury's hearing, but did not itself determine from that evidence that the confessions were voluntary. Instead it overruled Ashcraft's objection to the use of his alleged confession with the statement that, "This Court is not able to hold, as a matter of law, that reasonable minds might not differ on the question of whether or not that alleged confession was voluntarily obtained." And it likewise overruled Ware's objection to use of his alleged confession, stating that "the reasonable minds of twelve men might . . . differ as to . . . whether Ware's confession was voluntary, and . . . therefore, that is a question of fact for the jury to pass on." [1] Nor did the

---

[1] The legal test applied by the trial court to determine the admissibility of the two confessions was stated thus:

"The Court has come to the conclusion . . . that the law in Tennessee with reference to confession is simply this: it is largely

State Supreme Court review the evidence pertaining to the confessions and affirmatively hold them voluntary. In sustaining the petitioners' convictions, one Justice dissenting, it went no further than to point out that, "The trial judge . . . held . . . he could not say that the confessions were not voluntarily made and, therefore, permitted them to go to the jury," and to declare that it, likewise, was "unable to say that the confessions were not freely and voluntarily made." [2]

If, therefore, the question of the voluntariness of the two confessions was actually decided at all it was by the jury. And the jury was charged generally on the subject of the two confessions as follows:

"I further charge you that if verbal or written statements made by the defendants freely and voluntarily and without fear of punishment or hope of reward, have been proven to you in this case, you may take them into consideration with all of the other facts and circumstances in the case. . . . In statements made at the time of the arrest, you may take into consideration the condition of the minds of the prisoners owing to their arrest and

a question of fact as to whether or not a confession is voluntary, and is made without hope of reward or fear of punishment. It only becomes a question of law for the Court to decide when, from the facts surrounding the taking of the alleged confessions or statements, the Court, as a matter of law, can hold that the State has failed to carry its burden, which it has of showing that the confessions were free and voluntary, and that reasonable minds could not differ, and could come to but one conclusion that the confessions were involuntary and forced."

[2] Notwithstanding the apparent fact that neither the trial court nor the appellate court affirmatively held the confessions voluntary, the Tennessee Supreme Court, in its opinion, restated the rule it had announced in previous cases, that, "When confessions are offered as evidence, their competency becomes a preliminary question, to be determined by the court. . . . [If] the judge allow the jury to determine the preliminary fact, it is error, for which the judgment will be reversed." See *Self* v. *State*, 65 Tenn. 244, 253.

whether they were influenced by motives of hope or fear, to make the statements. Such a statement is competent evidence against the defendant who makes it and is not competent evidence against the other defendant . . . You cannot consider it for any purpose against the other defendant."

Concerning Ashcraft's alleged confession this general charge constituted the sole instruction to the jury.[3] But with regard to Ware's alleged confession the jury further was instructed:

"It is his [Ware's] further theory that he was induced by the fear of violence at the hands of a mob and by fear of the officers of the law to confess his guilt of the crime charged against him, but that such confession was false and that he had nothing whatsoever to do with, and no knowledge of the alleged crime. If you believe the theory of the defendant, Ware, . . . it is your duty to acquit him."

Having submitted the two alleged confessions to the jury in this manner, the trial court instructed the jury that: "What the proof may show you, if anything, that the defendants have said against themselves, the law presumes to be true, but anything the defendants have said in their own behalf, you are not obliged to believe. . . ."

This treatment of the confessions by the two state courts, the manner of the confessions' submission to the jury, and the emphasis upon the great weight to be given confessions make all the more important the kind of "independent examination" of petitioners' claims which, in

---

[3] On motion for new trial, Ashcraft's counsel urged error in that, "The court . . . in delivering his charge to the jury . . . in no place or at any time . . . presented the theory of the defendant Ashcraft to the jury. He wholly and completely in his charge ignored the contention and theory of the defendant Ashcraft that the alleged confession or admissions made by him . . . were not freely and voluntarily made. . . ."

any event, we are bound to make. *Lisenba* v. *California,* 314 U. S. 219, 237–238. Our duty to make that examination could not have been "foreclosed by the finding of a court, or the verdict of a jury, or both." *Id.* We proceed therefore to consider the evidence relating to the circumstances out of which the alleged confessions came.

*First, as to Ashcraft.* Ashcraft was born on an Arkansas farm. At the age of eleven he left the farm and became a farm hand working for others. Years later he gravitated into construction work, finally becoming a skilled dragline and steam-shovel operator. Uncontradicted evidence in the record was that he had acquired for himself "an excellent reputation." In 1929 he married the deceased Zelma Ida Ashcraft. Childless, they accumulated, apparently through Ashcraft's earnings, a very modest amount of jointly held property including bank accounts and an equity in the home in which they lived. The Supreme Court of Tennessee found "nothing to show but what the home life of Ashcraft and the deceased was pleasant and happy." Several of Mrs. Ashcraft's friends who were guests at the Ashcraft home on the night before her tragic death testified that both husband and wife appeared to be in a happy frame of mind.

The officers first talked to Ashcraft about 6 P. M. on the day of his wife's murder as he was returning home from work. Informed by them of the tragedy, he was taken to an undertaking establishment to identify her body which previously had been identified only by a driver's license. From there he was taken to the county jail where he conferred with the officers until about 2 A. M. No clues of ultimate value came from this conference, though it did result in the officers' holding and interrogating the Ashcrafts' maid and several of her friends. During the following week the officers made extensive investigations in Ashcraft's neighborhood and

elsewhere and further conferred with Ashcraft himself on several occasions, but none of these activities produced tangible evidence pointing to the identity of the murderer.

Then, early in the evening of Saturday, June 14, the officers came to Ashcraft's home and "took him into custody." In the words of the Tennessee Supreme Court,

"They took him to an office or room on the northwest corner of the fifth floor of the Shelby County jail. This office is equipped with all sorts of crime and detective devices such as a fingerprint outfit, cameras, high-powered lights, and such other devices as might be found in a homicide investigating office. . . . It appears that the officers placed Ashcraft at a table in this room on the fifth floor of the county jail with a light over his head and began to quiz him. They questioned him in relays until the following Monday morning, June 16, 1941, around nine-thirty or ten o'clock. It appears that Ashcraft from Saturday evening at seven o'clock until Monday morning at approximately nine-thirty never left this homicide room on the fifth floor." [4]

Testimony of the officers shows that the reason they questioned Ashcraft "in relays" was that they became so tired they were compelled to rest. But from 7:00 Saturday evening until 9:30 Monday morning Ashcraft had no rest. One officer did say that he gave the suspect a single five minutes' respite, but except for this five minutes the procedure consisted of one continuous stream of questions.

As to what happened in the fifth-floor jail room during this thirty-six hour secret examination the testimony

---

[4] From the testimony it appears that Ashcraft was taken from the jail about 11 o'clock Sunday night for a period of approximately an hour to help the officers hunt the place where Ware lived. On his return Ashcraft was, for a short time, kept in a jail room different from that in which he was kept the rest of the time.

150

follows the usual pattern and is in hopeless conflict.[5] Ashcraft swears that the first thing said to him when he was taken into custody was, "Why in hell did you kill your wife?"; that during the course of the examination he was threatened and abused in various ways; and that as the hours passed his eyes became blinded by a powerful electric light, his body became weary, and the strain on his nerves became unbearable.[6] The officers, on the other hand, swear that throughout the questioning they were kind and considerate. They say that they did not accuse Ashcraft of the murder until four hours after he was brought to the jail building, though they freely admit that from that time on their barrage of questions was constantly directed at him on the assumption that he was

[5] "As the report avers, 'The third degree is a secret and illegal practice.' Hence the difficulty of discovering the facts as to the extent and manner it is practiced." IV Reports of National Committee on Law Observance and Enforcement (Wickersham Commission), U. S. Government Printing Office, 1931, Lawlessness in Law Enforcement, p. 3. Station houses and jails are most frequently employed for third degree practices, "upstairs rooms or back rooms being sometimes picked out for their greater privacy." *Id.*, The Third Degree, p. 170. Cf. *Chambers* v. *Florida,* 309 U. S. 227, 238.

[6] " 'Work' is the term used to signify any form of what is commonly called the third degree, and may consist in nothing more than a severe cross-examination. Perhaps in most cases it is no more than that, but the prisoner knows that he is wholly at the mercy of his inquisitor and that the severe cross-examination may at any moment shift to a severe beating. . . . Powerful lights turned full on the prisoner's face, or switched on and off have been found effective. . . . The most commonly used method is persistent questioning, continuing hour after hour, sometimes by relays of officers. It has been known since 1500 at least that deprivation of sleep is the most effective torture and certain to produce any confession desired." Report of Committee on Lawless Enforcement of Law made to the Section of Criminal Law and Criminology of the American Bar Association (1930) 1 American Journal of Police Science 575, 579–580, also quoted in IV Wickersham Report, *supra,* p. 47.

the murderer. Together with other persons whom they brought in on Monday morning to witness the culmination of the thirty-six hour ordeal the officers declare that at that time Ashcraft was "cool," "calm," "collected," "normal"; that his vision was unimpaired and his eyes not bloodshot; and that he showed no outward signs of being tired or sleepy.

As to whether Ashcraft actually confessed, there is a similar conflict of testimony. Ashcraft maintains that although the officers incessantly attempted by various tactics of intimidation to entrap him into a confession, not once did he admit knowledge concerning or participation in the crime. And he specifically denies the officers' statements that he accused Ware of the crime, insisting that in response to their questions he merely gave them the name of Ware as one of several men who occasionally had ridden with him to work. The officers' version of what happened, however, is that about 11 P. M. on Sunday night, after twenty-eight hours' constant questioning, Ashcraft made a statement that Ware had overpowered him at his home and abducted the deceased, and was probably the killer. About midnight the officers found Ware and took him into custody, and, according to their testimony, Ware made a self-incriminating statement as of early Monday morning, and at 5:40 A. M. signed by mark a written confession in which appeared the statement that Ashcraft had hired him to commit the murder. This alleged confession of Ware was read to Ashcraft about six o'clock Monday morning, whereupon Ashcraft is said substantially to have admitted its truth in a detailed statement taken down by a reporter. About 9:30 Monday morning a transcript of Ashcraft's purported statement was read to him. The State's position is that he affirmed its truth but refused to sign the transcript, saying that he first wanted to consult his lawyer. As to

this latter 9:30 episode the officers' testimony is reinforced by testimony of the several persons whom they brought in to witness the end of the examination.

In reaching our conclusion as to the validity of Ashcraft's confession we do not resolve any of the disputed questions of fact relating to the details of what transpired within the confession chamber of the jail or whether Ashcraft actually did confess.[7] Such disputes, we may say, are an inescapable consequence of secret inquisitorial practices. And always evidence concerning the inner details of secret inquisitions[8] is weighted against an accused,

---

[7] The use in evidence of a defendant's coerced confession cannot be justified on the ground that the defendant has denied he ever gave the confession. *White* v. *Texas*, 310 U. S. 530, 531–532.

[8] State and federal courts, textbook writers, legal commentators, and governmental commissions consistently have applied the name of "inquisition" to prolonged examination of suspects conducted as was the examination of Ashcraft. See, e. g., cases cited in IV Wickersham Report, *supra*, and also pp. 44, 47, 48, and passim; Pound (Cuthbert W.), Inquisitorial Confessions, 1 Cornell L. Q. 77; *Chambers* v. *Florida*, 309 U. S. 227, 237; *Bram* v. *United States*, 168 U. S. 532, 544; *Brown* v. *Walker*, 161 U. S. 591, 596; *Counselman* v. *Hitchcock*, 142 U. S. 547, 573; cf. *Cooper* v. *State*, 86 Ala. 610, 611, 6 So. 110. In a case where no physical violence was inflicted or threatened, the Supreme Court of Virginia expressly approved the statement of the trial judge that the manner and methods used in obtaining the confession read "like a chapter from the history of the inquisition of the Middle Ages." *Enoch* v. *Commonwealth*, 141 Va. 411, 423, 126 S. E. 222, 225; and see *Cross* v. *State*, 142 Tenn. 510, 514, 221 S. W. 489. The analogy, of course, was in the fact that old inquisition practices included questioning suspects in secret places, away from friends and counsel, with notaries waiting to take down "confessions," and with arrangements to have the suspect later affirm the truth of his confession in the presence of witnesses who took no part in the inquisition. See Encyclopedia Britannica, Fourteenth Ed., "Inquisition"; Prescott, Ferdinand and Isabella, Sixth Ed., Part First, Chap. VII, The Inquisition; VIII Wigmore on Evidence, Third Ed., p. 307. "In the more serious offenses the party suspected is arrested, he is placed on his inquisition before the chief of police, and

particularly where, as here, he is charged with a brutal crime, or where, as in many other cases, his supposed offense bears relation to an unpopular economic, political, or religious cause.

Our conclusion is that if Ashcraft made a confession it was not voluntary but compelled. We reach this conclusion from facts which are not in dispute at all. Ashcraft, a citizen of excellent reputation, was taken into custody by police officers. Ten days' examination of the Ashcrafts' maid, and of several others, in jail where they were held, had revealed nothing whatever against Ashcraft. Inquiries among his neighbors and business associates likewise had failed to unearth one single tangible clue pointing to his guilt. For thirty-six hours after Ashcraft's seizure during which period he was held incommunicado, without sleep or rest, relays of officers, experienced investigators, and highly trained lawyers questioned him without respite. From the beginning of the questioning at 7 o'clock on Saturday evening until 6 o'clock on Monday morning Ashcraft denied that he had anything to do with the murder of his wife. And at a hearing

a statement is obtained. . . . Where the office of the district attorney is in political harmony with the police system, the district attorney is generally invited to be present as an inquisitor." 2 Wharton on Criminal Evidence, Eleventh Ed., pp. 1021–1022; and see Notes 5 and 6, *supra*.

An admirable summary of the generally expressed judicial attitude toward these practices is set forth in the Report of The Committee on Lawless Enforcement of Law, 1 Amer. Journ. of Police Science, *supra*, p. 587: "Holding incommunicado is objectionable because arbitrary—at the mere will and unregulated pleasure of a police officer. . . . The use of the third degree is obnoxious because it is secret; because the prisoner is wholly unrepresented; because there is present no neutral, impartial authority to determine questions between the police and the prisoner; because there is no limit to the range of the inquisition, nor to the pressure that may be put upon the prisoner."

154

before a magistrate about 8:30 Monday morning Ashcraft
pleaded not guilty to the charge of murder which the
officers had sought to make him confess during the pre-
vious thirty-six hours.

We think a situation such as that here shown by un-
contradicted evidence is so inherently coercive that its
very existence is irreconcilable with the possession of men-
tal freedom by a lone suspect against whom its full co-
ercive force is brought to bear.[9] It is inconceivable that
any court of justice in the land, conducted as our courts
are, open to the public, would permit prosecutors serving
in relays to keep a defendant witness under continuous
cross-examination for thirty-six hours without rest or sleep
in an effort to extract a "voluntary" confession. Nor can
we, consistently with Constitutional due process of law,
hold voluntary a confession where prosecutors do the same
thing away from the restraining influences of a public trial
in an open court room.[10]

---

[9] *Bram* v. *United States*, 168 U. S. 532, 556, 562–563; see also *Wan*
v. *United States*, 266 U. S. 1, 14–15; *Burdeau* v. *McDowell*, 256 U. S.
465, 475; *Counselman* v. *Hitchcock*, 142 U. S. 547, 573–574; 3 Elliot's
Debates, pp. 445–449, 452; cf. *Chambers* v. *Florida*, 309 U. S. 227.
The question in the *Bram* case was whether Bram had been compelled
or coerced by a police officer to make a self-incriminatory statement,
contrary to the Fifth Amendment; and the question here is whether
Ashcraft similarly was coerced to make such a statement, contrary to
the Fourteenth Amendment. *Lisenba* v. *California*, 314 U. S. 219,
236–238. Taken together, the *Bram* and *Lisenba* cases hold that a
coerced or compelled confession cannot be used to convict a defendant
in any state or federal court. And the decision in the *Bram* case
makes it clear that the admitted circumstances under which Ash-
craft is alleged to have confessed preclude a holding that he acted
voluntarily.

[10] Compare the following allegation contained in Ashcraft's motion
for new trial, "The Sheriff's deputies . . . set themselves up as a quasi
judicial tribunal and tried . . . and convicted him there and in so doing
rendered a trial . . . before the trial court . . . and the jury of peers
. . . a mere formality," with *Lisenba* v. *California, supra*, p. 237. "The

The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession.[11]  There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture.  So long as the Constitution remains the basic law of our Republic, America will not have that kind of government.

*Second, as to Ware.*  Ashcraft and Ware were jointly tried, and were convicted on the theory that Ashcraft hired Ware to perform the murder.  Ware's conviction was sustained by the Tennessee Supreme Court on the assumption that Ashcraft's confession was properly admitted and his conviction valid.  Whether it would have been sustained had the court reached the conclusion we have reached as to Ashcraft we cannot know.  Doubt as to what the state court would have done under the changed

requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . ."  Cooley's Constitutional Limitations, Sixth Ed. (1890) p. 379; see also *Keddington* v. *State,* 19 Ariz. 457, 459, 172 P. 273. "The aid of counsel in preparation would be farcical if the case could be foreclosed by a preliminary inquisition which would squeeze out conviction or prejudice by means unconstitutional if used at the trial." *Wood* v. *United States,* 128 F. 2d 265, 271.  See also *Chambers* v. *Florida, supra,* p. 237, Note 10.

[11] *Chambers* v. *Florida,* 309 U. S. 227; *Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 310 U. S. 530; *Lomax* v. *Texas,* 313 U. S. 544; *Vernon* v. *Alabama,* 313 U. S. 547; *Lisenba* v. *California,* 314 U. S. 219, 236–238; *Ward* v. *Texas,* 316 U. S. 547, 555; and see *Bram* v. *United States,* 168 U. S. 532.

circumstances brought about by our reversal of its decision as to Ashcraft is emphasized by the position of the State's representatives in this Court. They have asked that if we reverse Ashcraft's conviction we also reverse Ware's.

In disposing of cases before us it is our responsibility to make such disposition as justice may require. "And in determining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered." *Patterson* v. *Alabama*, 294 U. S. 600, 607; *State Tax Commission* v. *Van Cott*, 306 U. S. 511, 515–516. Application of this guiding principle to the case at hand requires that we send Ware's case back to the Tennessee Supreme Court. Should that Court in passing on Ware's conviction in the light of our ruling as to Ashcraft adopt the State Attorney General's view and reverse the conviction there then would be no occasion for our passing on the federal question here raised by Ware. Under these circumstances we vacate the judgment of the Tennessee Supreme Court affirming Ware's conviction, and remand his case to that Court for further proceedings.

The judgment affirming Ashcraft's conviction is reversed and the cause is remanded to the Supreme Court of Tennessee for proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Jackson, dissenting:

A sovereign State is now before us, summoned on the charge that it has obtained convictions by methods so unfair that a federal court must set aside what the state courts have done. Heretofore the State has had the benefit of a presumption of regularity and legality. A confession made by one in custody heretofore has been

admissible in evidence unless it was proved and found that it was obtained by pressures so strong that it was *in fact* involuntarily made, that the individual will of the particular confessor had been overcome by torture, mob violence, fraud, trickery, threats, or promises. Even where there was excess and abuse of power on the part of officers, the State still was entitled to use the confession if upon examination of the whole evidence it was found to negative the view that the accused had "so lost his freedom of action that the statements made were not his but were the result of the deprivation of his free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California,* 314 U. S. 219, 241.

In determining these issues of fact, respect for the sovereign character of the several States always has constrained this Court to give great weight to findings of fact of state courts. While we have sometimes gone back of state court determinations to make sure whether the guaranties of the Fourteenth Amendment have or have not been violated, in close cases the decisions of state courts have often been sufficient to tip the scales in favor of affirmance. *Lisenba* v. *California, supra,* 238, 239; *Buchalter* v. *New York,* 319 U. S. 427, 431; cf. *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 294.

As we read the present decision the Court in effect declines to apply these well-established principles. Instead, it: (1) substitutes for determination on conflicting evidence the question whether this confession was actually produced by coercion, a presumption that it was, on a new doctrine that examination in custody of this duration is "inherently coercive"; (2) it makes that presumption irrebuttable—i. e., a rule of law—because, while it goes back of the state decisions to find certain facts, it refuses to resolve conflicts in evidence to determine whether other of

the State's proof is sufficient to overcome such presumption; and, in so doing, (3) it sets aside the findings by the courts of Tennessee that on all the facts this confession did not result from coercion, either giving those findings no weight or regarding them as immaterial.

We must bear in mind that this case does not come here from a lower federal court over whose conduct we may assert a general supervisory power. If it did, we should be at liberty to apply rules as to the admissibility of confessions, based on our own conception of permissible procedure, and in which we may embody restrictions even greater than those imposed upon the States by the Fourteenth Amendment. See *Bram* v. *United States,* 168 U. S. 532; *Wan* v. *United States,* 266 U. S. 1; *McNabb* v. *United States,* 318 U. S. 332, 341; *United States* v. *Mitchell,* 322 U. S. 65. But we have no such supervisory power over state courts. We may not lay down rules of evidence for them nor revise their decisions merely because we feel more confidence in our own wisdom and rectitude. We have no power to discipline the police or law-enforcement officers of the State of Tennessee nor to reverse its convictions in retribution for conduct which we may personally disapprove.

The burden of protecting society from most crimes against persons and property falls upon the State. Different States have different crime problems and some freedom to vary procedures according to their own ideas. Here, a State was forced by an unwitnessed and baffling murder to vindicate its law and protect its society. To nullify its conviction in this particular case upon a consideration of all the facts would be a delicate exercise of federal judicial power. But to go beyond this, as the Court does today, and divine in the due process clause of the Fourteenth Amendment an exclusion of confessions on an irrebuttable presumption that custody and examination are "inherently coercive" if of some unspecified duration within

thirty-six hours, requires us to make more than a passing expression of our doubts and disagreements.

## I.

The claim of a suspect to immunity from questioning creates one of the most vexing problems in criminal law—that branch of the law which does the courts and the legal profession least credit. The consequences upon society of limiting examination of persons out of court cannot fairly be appraised without recognition of the advantage criminals already enjoy in immunity from compulsory examination in court. Of this latter Mr. Justice Cardozo, for an all but unanimous Court, said: "This too might be lost, and justice still be done. Indeed, today as in the past there are students of our penal system who look upon the immunity as a mischief rather than a benefit, and who would limit its scope, or destroy it altogether. No doubt there would remain the need to give protection against torture, physical or mental." *Palko* v. *Connecticut*, 302 U. S. 319, 325–26.

This Court never yet has held that the Constitution denies a State the right to use a confession just because the confessor was questioned in custody where it did not also find other circumstances that deprived him of a "free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California*, 314 U. S. 219, 241. The Constitution requires that a conviction rest on a fair trial. Forced confessions are ruled out of a fair trial. They are ruled out because they have been wrung from a prisoner by measures which are offensive to concepts of fundamental fairness. Different courts have used different terms to express the test by which to judge the inadmissibility of a confession, such as "forced," "coerced," "involuntary," "extorted," "loss of freedom of will." But always where we have professed to speak with the voice of the due process clause, the test, in whatever words stated, has been

applied to the particular confessor at the time of confession.

It is for this reason that American courts hold almost universally and very properly that a confession obtained during or shortly after the confessor has been subjected to brutality, torture, beating, starvation, or physical pain of any kind is *prima facie* "involuntary." The effect of threats alone may depend more on individual susceptibility to fear. But men are so constituted that many will risk the postponed consequences of yielding to a demand for a confession in order to be rid of present or imminent physical suffering. Actual or threatened violence have no place in eliciting truth and it is fair to assume that no officer of the law will resort to cruelty if truth is what he is seeking. We need not be too exacting about proof of the effects of such violence on the individual involved, for their effect on the human personality is invariably and seriously demoralizing.

When, however, we consider a confession obtained by questioning, even if persistent and prolonged, we are in a different field. Interrogation *per se* is not, while violence *per se* is, an outlaw. Questioning is an indispensable instrumentality of justice. It may be abused, of course, as cross-examination in court may be abused, but the principles by which we may adjudge when it passes constitutional limits are quite different from those that condemn police brutality, and are far more difficult to apply. And they call for a more responsible and cautious exercise of our office. For we may err on the side of hostility to violence without doing injury to legitimate prosecution of crime; we cannot read an undiscriminating hostility to mere interrogation into the Constitution without unduly fettering the States in protecting society from the criminal.

It probably is the normal instinct to deny and conceal any shameful or guilty act. Even a "voluntary confes-

sion" is not likely to be the product of the same motives with which one may volunteer information that does not incriminate or concern him. The term "voluntary" confession does not mean voluntary in the sense of a confession to a priest merely to rid one's soul of a sense of guilt. "Voluntary confessions" in criminal law are the product of calculations of a different order, and usually proceed from a belief that further denial is useless and perhaps prejudicial. To speak of any confessions of crime made after arrest as being "voluntary" or "uncoerced" is somewhat inaccurate, although traditional.

A confession is wholly and incontestably voluntary only if a guilty person gives himself up to the law and becomes his own accuser. The Court bases its decision on the premise that custody and examination of a prisoner for thirty-six hours is "inherently coercive." Of course it is. And so is custody and examination for one hour. Arrest itself is inherently coercive, and so is detention. When not justified, infliction of such indignities upon the person is actionable as a tort. Of course such acts put pressure upon the prisoner to answer questions. to answer them truthfully, and to confess if guilty.

But does the Constitution prohibit use of all confessions made after arrest because questioning, while one is deprived of freedom, is "inherently coercive"? The Court does not quite say so, but it is moving far and fast in that direction. The step it now takes is to hold this confession inadmissible because of the time taken in getting it.

The duration and intensity of an examination or inquisition always have been regarded as one of the relevant and important considerations in estimating its effect on the will of the individual involved. Thirty-six hours is a long stretch of questioning. That the inquiry was prolonged and persistent is a factor that in any calculation

of its effect on Ashcraft would count heavily against the confession. But some men would withstand for days pressures that would destroy the will of another in hours. Always heretofore the ultimate question has been whether the confessor was in possession of his own will and self-control at the time of confession. For its bearing on this question the Court always has considered the confessor's strength or weakness, whether he was educated or illiterate, intelligent or moronic, well or ill, Negro or white.

But the Court refuses in this case to be guided by this test. It rejects the finding of the Tennessee courts and says it must make an "independent examination" of the circumstances. Then it says that it will not "resolve any of the disputed questions of fact" relating to the circumstances of the confession. Instead of finding as a fact that Ashcraft's freedom of will was impaired, it substitutes the doctrine that the situation was "inherently coercive." It thus reaches on a *part* of the evidence in the case a conclusion which I shall demonstrate it could not properly reach on *all* the evidence. And it refuses to resolve the conflicts in the other evidence to determine whether it rebuts the presumption thus reached that the confession is a coerced one.

If the constitutional admissibility of a confession is no longer to be measured by the mental state of the individual confessor but by a general doctrine dependent on the clock, it should be capable of statement in definite terms. If thirty-six hours is more than is permissible, what about 24? or 12? or 6? or 1? All are "inherently coercive." Of course questions of law like this often turn on matters of degree. But are not the States entitled to know, if this Court is able to state, what the considerations are which make any particular degree decisive? How else may state courts apply our tests?

The importance of defining these new constitutional standards of admissibility of confessions is emphasized by the decision to return the companion case of Ware to the Supreme Court of Tennessee for reconsideration "in the light of our ruling as to Ashcraft." Except for Ware's own testimony, all of the evidence is that when he confronted Ashcraft in custody Ware confessed immediately, voluntarily, and almost spontaneously. But he had been arrested, taken from bed into custody, and detained and questioned. Does the doctrine of inherent coerciveness condemn the Ware confession? Should the Tennessee court decide whether Ware, obviously a much weaker character than Ashcraft, was *actually* coerced into confessing? It already has decided that question and this Court does not hold the fact determined wrongly. Ware's case is properly in this Court. Why should not this Court decide Ware's case on the merits and thus test and expound its novel ruling as applied to a different set of circumstances?

No one can regard the rule of exclusion dependent on the state of the individual's will as an easy one to apply. It leads to controversy, speculation, and variations in application. To eliminate these evils by eliminating all confessions made after interrogation while in custody is a drastic alternative, but it is the logical consequence of today's ruling, as its application to the facts of Ashcraft's case will show.

## II.

Apart from Ashcraft's uncorroborated testimony, which the Tennessee courts refused to believe, there is much evidence in this record from persons whom they did believe and were justified in believing. This evidence shows that despite the "inherent coerciveness" of the circumstances of his examination, the confession when made was delib-

erate, free, and voluntary in the sense in which that term is used in criminal law. This Court could not, in our opinion, hold this confession an involuntary one except by substituting its presumption in place of analysis of the evidence and refusing to weigh the evidence even in rebuttal of its presumption.

As in most such cases, we start with some admitted facts. In the early morning Mrs. Ashcraft left her home in an automobile to visit relatives. She was found murdered. She had not been robbed nor ravished, although an effort had been made to give the crime an appearance of robbery. The officers knew of no other motive for the killing and naturally turned to her husband for information.

On the afternoon of the crime, Thursday, June 5, 1941, they took Ashcraft to the morgue to identify the body, and to the county jail, where he was kept and interviewed until 2:00 a. m. He makes no complaint of his treatment at this time. In this and several later interviews he made a number of statements with reference to the condition of the car, and as to Mrs. Ashcraft's having taken a certain drug, and as to money which she was accustomed to carry on her person, which further investigation indicated to be untrue. Still Ashcraft was not arrested. He professed to be willing to assist in identifying the killer. At last, on Saturday evening, June 14, an officer brought Ashcraft to the jail for further questioning. He was taken to a room on the fifth floor and questioned intermittently by several officers over a period of about thirty-six hours.

There are two versions as to what happened during this period of questioning. According to the version of the officers, which was accepted by the court which saw the witnesses, what happened? On Saturday evening Ashcraft was taken to the jail, where he was questioned by Mr. Becker and Mr. Battle. Becker is in the Intelligence

Service of the United States Army at the present time and before that was in charge of the Homicide Bureau of the Sheriff's office of Shelby County, Tennessee. Battle has for eight years been an Assistant Attorney General of the County. They began questioning Ashcraft about 7:00 p. m. They recounted various statements of his which had proved untrue. About 11:00 o'clock Ashcraft said he realized the circumstances all pointed to him and that he could not explain the circumstances. They then accused him of the murder, but he denied it. About 3:00 a. m. Becker and Battle retired and left Ashcraft in charge of Ezzell, a special investigator connected with the Attorney General's office. He questioned Ashcraft and discussed the crime with him until about 7:00 on Sunday morning. Becker and Battle then returned and interviewed him intermittently until about noon, when Ezzell returned and remained until about 5:00. Becker then returned, and about 11:00 o'clock Sunday night Ashcraft expressed a desire to talk with Ezzell. Ezzell was sent for and Ashcraft told him he wanted to tell him the truth. He said, "Mr. Ezzell, a Negro killed my wife." Ezzell asked the Negro's name, and Ashcraft said, "Tom Ware." Up to this time Ware had not been suspected, nor had his name been mentioned. Ashcraft explained that he did not tell the officers before because "I was scared; the Negro said he would burn my house down if I told the law."

Thereupon Becker, Battle, Ezzell, and Mr. Jayroe, connected with the Sheriff's office, took Ashcraft in a car and found Ware. When questioned at the jail, Ware turned to Ashcraft and said in substance that he had told Ashcraft when this thing happened that he did not intend to take the entire blame. The officers thereupon turned their attention to Ware. He promptly admitted the killing and said Ashcraft hired him to do it. Waldauer, the court reporter, was called to take down this confession, and

completed his transcript at about 5:40 a. m. He read it to Ware and told him he did not have to sign it unless he so chose. Ware made his mark upon it and swore to it before Waldauer as a Notary Public. A copy was given to Ashcraft, and he then admitted that he had hired Ware to kill his wife. He was given breakfast and then in response to questions made a statement which was taken down by the court reporter, Waldauer. It was transcribed, but Ashcraft declined to sign it, saying that he wanted his lawyer to see it before he signed it. No effort was made to compel him to sign the confession. However, two business men of Memphis, Mr. Castle, vice president of a bank, and Mr. Pidgeon, president of the Coca-Cola Bottling Company, were called in. Both testified that Ashcraft in their presence asserted that the transcript was correct but that he declined to sign it. The officers also called Dr. McQuiston to the jail to make a physical examination of both Ashcraft and Ware. He had practiced medicine in Memphis for twenty-eight years and both Mr. and Mrs. Ashcraft had been his patients for something like five years. In the presence of this friendly doctor Ashcraft might have complained of his treatment and avowed his innocence. The doctor testified, however, that Ashcraft said he had been treated all right, that he made no complaint about his eyes, and that they were not bloodshot. The doctor made a physical examination, and says Ashcraft appeared normal. He further testified as to Ashcraft, "Well, sir, he said he had not been able to get along with his wife for some time; that her health had been bad; that he had offered her a property settlement, and that she might go her way and he his way; and he also stated that he offered this colored man, Ware, a sum of money to make away with his wife." [1] The doctor says

---

[1] The officers had been baffled as to any motive for Ashcraft to murder his wife (who was his third, two former ones having been

that that statement was entirely voluntary. No matter what pressure had been put on Ashcraft before, the courts below could reasonably believe that he made this statement voluntarily to a man of whom he had no fear and who knew his family relations.

Ashcraft's story of torture could only be accepted by disbelieving such credible and unimpeached contradiction. Ashcraft testified that he was refused food, and was not allowed to go to the lavatory, and was denied even a drink of water. Other testimony is that on Saturday night he was brought a sandwich and coffee about midnight; that he drank the coffee but refused the sandwich; that on Sunday morning he was given a breakfast and was fed again about noon a plate lunch consisting of meat and vegetables and coffee. Both Waldauer, the Reporter, and Dr. McQuiston testified that they saw breakfast served to Ashcraft the next morning before the statement taken down by Waldauer. Ashcraft claims he was threatened and that a cigarette was slapped out of his mouth. This is all denied.

This Court rejects the testimony of the officers and disinterested witnesses in this case that the confession was voluntary not because it lacked probative value in itself nor because the witnesses were self-contradictory or were impeached. On the contrary, it is impugned only on grounds such as that such disputes "are an inescapable consequence of secret inquisitorial practices." We infer from this that since a prisoner's unsupported word often conflicts with that of the officers, the officer's testimony for constitutional purposes is always *prima facie* false. We know that police standards often leave much to be desired, but we are not ready to believe that the democratic proc-

separated from him by divorce). He disclosed in his confession to them that her sickness had resulted in a degree of irritability which had made them incompatible and resulted in his sexual frustration.

ess brings to office men generally less believable than the average of those accused of crime.

Reference also is made to the fact that when petitioner was questioned investigation had failed "to unearth one single tangible clue pointing to his guilt." We cannot see the relevance of such circumstances on the question of the voluntary or involuntary character of his statements to the officers. Is the suggestion that if they had probable clews to his guilt, their questioning of him would have been better justified?

This questioning is characterized as a "secret inquisition," invoking all of the horrendous historical associations of those words. Certainly the inquiry was participated in by a good many persons, and we do not see how it could have been much less "secret" unless the press should have been called in. Of course, any questioning may be characterized as an "inquisition," but the use of such characterizations is no substitute for the detached and judicial consideration that the court below gave to the case.

We conclude that even going behind the state court decisions into the facts, no independent judgment on the whole evidence that Ashcraft's confession was in fact coerced is possible. And against this background of facts the extreme character of the Court's ruling becomes apparent.

I am not sure whether the Court denies the State all right to arrest and question the husband of the slain woman. No investigation worthy of the name could fail to examine him. Of all persons, he was most likely to know whether she had enemies or rivals. Would not the State have a constitutional right, whether he was accused or not, to arrest and detain him as a material witness? If it has the right to detain one as a witness, presumably it has the right to examine him.

Could the State not confront Ashcraft with his false statements and ask his explanation? He did not throw himself at any time on his rights, refuse to answer, and demand counsel, even according to his own testimony. The strategy of the officers evidently was to keep him talking, to give him plenty of rope and see if he would not hang himself. He does not claim to have made objection to this. Instead he relied on his wits. The time came when it dawned on him that his own story brought him under suspicion, and that he could not meet it. Must the officers stop at this point because he was coming to appreciate the uselessness of deception?

Then he became desperate and accused the Negro. Certainly from this point the State was justified in holding and questioning him as a witness, for he claimed to know the killer. That accusation backfired and only turned up a witness against him. He had run out of expedients and inventions; he knew he had lost the battle of wits. After all, honesty seemed to be the best, even if the last, policy. He confessed in detail.

At what point in all this investigation does the Court hold that the Constitution commands these officers to send Ashcraft on his way and give up the murder as insoluble? If the State is denied the right to apply any pressure to him which is "inherently coercive" it could hardly deprive him of his freedom at all. I, too, dislike to think of any man, under the disadvantages and indignities of detention being questioned about his personal life for thirty-six hours or for one hour. In fact, there is much in our whole system of penology that seems archaic and vindictive and badly managed. Every person in the community, no matter how inconvenient or embarrassing, no matter what retaliation it exposes him to, may be called upon to take the witness stand and tell all he knows about a crime—except the person who knows most about it.

Efforts of prosecutors to compensate for this handicap by violent or brutal treatment or threats we condemn as passionately and sincerely as other members of the Court. But we are not ready to say that the pressure to disclose crime, involved in decent detention and lengthy examination, although we admit them to be "inherently coercive," are denied to a State by the Constitution, where they are not proved to have passed the individual's ability to resist and to admit, deny, or refuse to answer.

## III.

The Court either gives no weight to the findings of the Tennessee courts or it regards their inquiry as to the effect on the individuals involved as immaterial. We think it was a material inquiry and that respect is due to their conclusion.

The Supreme Court of Tennessee, writing in this case, stated the law of that State by which it reviewed and affirmed the action of the trial court. It said, "When confessions are offered as evidence, their competency becomes a preliminary question to be determined by the court. This imposes upon the presiding judge the duty of deciding *the fact* whether the party making the confession was influenced by hope or fear. This rule is so well established, that if the judge allow the jury to determine the preliminary fact, it is error, for which the judgment will be reversed.

"In the instant case the trial judge heard the witnesses as to their confessions out of the presence of the jury, and he held that under the facts he could not say that the confessions were not voluntarily made and, therefore, permitted them to go to the jury." (Emphasis supplied.)

The rule of law thus laid down complied with the law as this Court had settled it at the time of trial.

The Tennessee Supreme Court made a painstaking examination of the evidence in the light of the claim that

the confessions were coerced. It concluded that it was "unable to say that the confessions were not freely and voluntarily made. Both of the plaintiffs in error have had a fair trial and we decline to disturb the conviction."

That court, it is clear, renders no mere lip service to the guaranties of the Constitution. In other cases it has set aside convictions because confessions used at trials were found to have been coerced.[2] There is not the least indication that the court was passionate or biased or that the result does not represent the honest judgment of a high-minded court, sensitive to these problems.

A trial judge out of hearing of the jury saw and heard Ashcraft and saw and heard those whom Ashcraft accused of coercing him. In determining a matter of this kind no one can deny the great advantage of a court which may see and hear a man who claims that his will succumbed and those who, it is claimed, were so overbearing. The real issue is strength of character, and a few minutes' observation of the parties in the courtroom is more informing than reams of cold record. There is not the slightest indication that the trial judge was prejudiced or indifferent to the prisoner's rights. Ashcraft's counsel moved to exclude his confession "for the reason that the statements contained therein were not freely and voluntarily made, nor were they free from duress and restraint, but were secured by compulsion. . . ." The court said, ". . . the sole proposition, as the Court sees it from this testimony, is that he was confined and questioned for a period of approximately thirty-six hours. I think counsel concedes that is practically the main ground upon which he rests his motion. There was no physical violence offered to the defendant Ashcraft, and none claimed." He overruled the motion and received the confession. This

---

[2] *Deathridge* v. *State,* 33 Tenn. 75; *Strady* v. *State,* 45 Tenn. 300; *Self* v. *State,* 65 Tenn. 244; *Cross* v. *State,* 142 Tenn. 510, 221 S. W. 489; *Rounds* v. *State,* 171 Tenn. 511, 106 S. W. 2d 212.

Court, not one of whose members ever saw Ashcraft or any one of the State's witnesses, overturns the decision by the trial judge.

Moreover, a jury held Ashcraft's statements incredible. After the trial judge, out of their presence, heard the evidence and decided the confession was admissible, the jury heard the evidence to decide whether the confession should be believed. Ashcraft again testified and so did all of the witnesses for the State. Conduct of the hearing both by the judge and the prosecutors was above criticism. The Court observes: "If, therefore, the question of the voluntariness of the two confessions was actually decided at all it was by the jury." Is it suggested that a State consistently with the Constitution may not leave this question to the sole determination of a jury? I had supposed that the constitutional duty of a State when such questions of fact arise is to furnish due process of law for deciding them. Does not jury trial meet this test? Here Tennessee, and I think very commendably, provided the double safeguards of a preliminary trial by the judge and a final determination by the jury.

The Court's opinion makes a critical reference to the charge of the trial judge. However, diligent counsel took no exception to the part of the charge quoted, made no request for further instruction on the subject, and assigned no error to the charge. Even if we think the charge inadequate, does the inadequacy of a charge constitute want of due process? And if so, do we review questions as to the charge although counsel for the petitioner made no objection during the trial when the judge could have corrected the error, but after the trial was over assigned it as one of twelve reasons for demanding a new trial?

No conclusion that this confession was actually coerced can be reached on this record except by reliance upon the utterly uncorroborated statements of defendant Ashcraft.

His testimony does not carry even ordinary guaranties of truthfulness, and the courts and jury were not bound to accept it. Perjury is a light offense compared to murder and they may well have believed that Ashcraft was ready to resort to a lesser crime to avoid conviction of a greater one. Furthermore, the very grounds on which this Court now upsets his conviction Ashcraft repudiated at the trial. He asserts that he was abused, but he does not testify as this Court holds that it had the effect of forcing an involuntary confession from him. On the contrary, he flatly insists that it had no such effect and that he never did confess at all.

Against Ashcraft's word the state courts and jury accepted the testimony of several apparently disinterested witnesses of high standing in their communities, in addition to that of the accused officers. One of the witnesses to Ashcraft's admission of guilt was his own family physician, two were disinterested businessmen of substance and standing, another was an experienced court reporter who had long held this position of considerable trust. Another was a member of the bar. Certainly, the state courts were not committing an offense against the Constitution of the United States in refusing to believe that this whole group of apparently reputable citizens entered into a conspiracy to swear a murder onto an innocent man, against whom not one of them is shown to have had a grievance or a grudge.

This is not the case of an ignorant and unrepresented defendant who has been the victim of prejudice. Ashcraft was a white man of good reputation, good position, and substantial property. For a week after this crime was discovered he was not detained, although his stories to the officers did not hang together, but was at large, free to consult his friends and counsel. There was no indecent haste, but on the contrary evident deliberation, in suspect-

ing and accusing him. He was not sentenced to death, but for a term that probably means life. He was defended by resourceful and diligent counsel.

The use of the due process clause to disable the States in protection of society from crime is quite as dangerous and delicate a use of federal judicial power as to use it to disable them from social or economic experimentation. The warning words of Mr. Justice Holmes in his dissenting opinion in *Baldwin* v. *Missouri*, 281 U. S. 586, 595, seem to us appropriate for rereading now.

MR. JUSTICE ROBERTS and MR. JUSTICE FRANKFURTER join in this opinion.