Paul SMITH, Appellant,

v.

STATE of Missouri, Respondent.

No. 56686.

Supreme Court of Missouri,
Division No. 1.

March 13, 1972.

William A. Richter, Thomas L. Geiger, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, for movant-appellant.

John C. Danforth, Atty. Gen., Alfred C. Sikes, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Commissioner.

Appeal from denial, after evidentiary hearing, of motion under Criminal Rule

27.26, V.A.M.R., to vacate and set aside judgment of conviction of murder, first degree.

On January 18, 1956, Paul Smith was convicted by a jury of murder, first degree, and the jury assessed his punishment at life imprisonment. Sentence and judgment were rendered accordingly, and the judgment of conviction was affirmed upon appeal. State v. Smith, Mo., 310 S.W.2d 845.

In this collateral attack on his conviction, movant asserted, as his ground for relief, that his confession was admitted into evidence without a prior determination by the trial court as to its voluntariness.

Utilizing the procedure of State v. Ussery, Mo., 452 S.W.2d 146, 151–152, and in compliance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, the court accorded, as a part of movant's hearing pursuant to Rule 27.26, an independent hearing to determine if movant's confession was voluntary. Evidence was adduced by both movant and the State by way of the trial transcript and from witnesses at the hearing.

Identification of defendant's statement at trial was made through Detective Sergeant Fred Grimes who witnessed defendant's signature to the statement. Sergeant Grimes had brought defendant before Assistant Circuit Attorney Edward W. Sumner on the evening of June 23, 1955. Mr. Sumner took the statement at 3:15 p. m., after which it was transcribed by the stenographer and placed before the defendant and signed by him at 10:40 a. m., June 24, 1955. Defendant's signature was witnessed also by Detective Wardell Spencer. Pertinent parts of the statement follow:

" 'Q. What is your full name? A. Paul Smith. Q. Do you have a middle initial? A. No. Q. Where do you live? A. 5160 Kensington. Q. Did you ever go by any other names? A. No.

" 'Q. You know that you don't have to give a statement, that anything you say can be used against you? A. Yes. Q. Nobody has exercised any brutality on you or nobody has promised you anything? A. No. Q. Now, Paul, I am going to ask you about last Friday night, June 17, and I want you to tell me just exactly what happened regarding this occurrence.

\* \* \* \* \* \*

" 'Q. When David told you this man had a roll on him, was that before the two of them went out to the corner? A. Well, now, I might say here—'

"MR. DRAPER: I am going to object to that, he is supposed to be reading the statement. MR. McMILLIAN: Read it as it is, Sergeant.

"A. Well, the word in the question is 'w-n-e-t'; that is a correction, and he initialed it. The way it is here 'w-n-e-t' and that is initialed 'P.S.'— 'When David told you this man had a roll on him, was that before the two of them went out to the corner? A. Before the (sic) went out of the tavern. \* \* \* Q. The next time you saw them, they went out on the corner? A. Yes, I gets up and walks outside and stands by the tavern. David called me something, he said my brother so and so. Q. Did he call you a nickname? A. A phony name to keept (sic)—' that is initialed 'P.S.'—'the man from knowing my real name. So I walked on down and said, "What do you want?" He said, "This man is looking for some prostitutes." I said, "You know where the house is, take him on around," and the man walks on around Enright and stops in front of 5119. I walks on around and we stand there for a little while and talks, the three of us. Then this other fellow, William Blakely, walks around the corner and comes down Enright and walks past us. He turns around and comes back and asked us, "What you all got—a trick?" Just like that. I said, "Yeah." Q. What do you mean you had a trick? A. You know a robbery. A fellow I could rob. So we

stopped by this—' That is the end of page two and it is signed by Paul Smith. Then on page three continuing: '—tree, we started talking to the man, just talking about these prostitutes, how much they charge you. I told him it might cost $7.00, $2.00 for the room and $5.00 for the woman. He said, "I don't think I can pay that much." I got upset over that after he said he couldn't pay the $7.00. Q. Why did you get upset? A. Because of the bankroll he was supposed to have. I thought he had a bigger roll, and so I hauls off and hits him. He staggered back. Someone, between this other fellow, William and David grabs him and flops him to the ground. Q. When you hit him, where were you standing at that time? A. Leaning against the tree. Q. What part of him did you hit? A. I think I hit him on the side of the head. Q. Was the man sober at that time? A. I don't know if he was actually drunk or note (sic), maybe it was the way he walked, maybe he had a limp.

" 'After you hit him, what happened? A. He staggered back and someone, either David or William flopped him to the ground. Q. When they flopped him to the ground, was it face first or back first? A. I can't remember. I had my back turned like this. Q. That was after you lhit (sic) him?' And he has initialed a typographical error there, 'P.S.' 'A. Yeah, they both was up on him. I got up on him. This William came out of his pocket with a $5.00 bill. Q. Why did you turn your back after you hit him? A. I don't know why I turned my back. It threw my arm.' He has initialed that correction, 'mu,' with 'P.S.' Continuing that answer: 'I thought maybe I had fractured my arm. I went down holding my arm like that.

\* \* \* \* \* \*

" 'Q. Did you see William the next day? A. No, I didn't see him. Q. When did you see him? A. Sunday morning. Q. Did you have any conversation about this man? A. He told me, "Have you heard any news?" I said, "No." He said, "The fellow died," or something like that.

\* \* \* \* \* \*

" 'Q. You understand, of course, you don't have to make this statement? A. Yeah. Q. I haven't made any promises or the police officers haven't made any promises to you?'

"That is the end of page five, and that is signed by Paul Smith. And then page six: 'A. No. Q. Haven't threatened you at all? A. No. Q. You have made this statement of your own free will? A. Yes.'

"Then there is this paragraph: 'I have read the foregoing statement consisting of five pages and have made all necessary corrections and have initialed all changes. This statement is true to the best of my knowledge and belief.' "

Marion Tyner was the stenographer who transcribed defendant's question and answer statement. She saw no beating, threatening, or abuse directed at Paul Smith and she heard no promises offered to him.

Fred Grimes, now a lieutenant, recalled his investigation of the matters involving Paul Smith in June, 1955. Officers Edward Mucherson and Alphonso Kidd arrested Paul Smith in the early morning, June 19, 1955, suspected of the fatal assault of Lee Bunch. Smith was taken to the ninth district station and Lieutenant Grimes first saw him shortly after 9:00 a. m., June 20, 1955. He and his partner, Detective Wardell Spencer, with Lieutenant Bolden present, questioned him for about thirty minutes. On neither of these occasions was there any abuse, promise, or threat offered Smith. He made no statement on this date other than to furnish the last name of another suspect, David Hill.

Lieutenant Grimes questioned Smith again on June 21, 1955, for thirty or forty-five minutes, and against on June 22, 1955. No beating, threat, or promise was offered. On the latter occasion, Smith gave the officers a verbal statement. He was not certain whether Smith asked to see any relative or friend, but "to my recollection he might have even had a

visitor or so, * * * but any reasonable request, I am sure, was complied with." Smith was never denied any food or drink and he recalled no need for medical attention. After the written statement was typed, he could not recall whether the statement was read to Smith. "I think that Mr. Smith was furnished a copy for his reading as to the correctness of it as well as Detective Spencer and myself." Smith made no statement regarding ability to read and write, and he had no personal knowledge of such ability. He grew up in the same neighborhood with Smith and knew he had attended Simmons Elementary School.

Lieutenant Grimes also recalled that Smith had been "booked" on the 20th for investigation. He was not sure when the charge warrant was issued. He did not recall any request between June 20 and June 24 from Smith to use the telephone to call his mother. "I don't recall him making such a request to me, because I am sure I would have complied with it, since I knew his family."

According to Lieutenant Grimes, the initialed portions of the statement "were initials which I directed to Paul Smith's attention for correction, and had him initial each one."

Edward Sumner, Jr., now a Clayton attorney, recognized the statement as one he had taken from Paul Smith in June, 1955. No one physically abused or promised Smith anything during the process. He advised Smith that he did not have to make a statement and that any statement he made would be used against him. He asked if he had suffered any brutality and he answered in the negative.

Wardell Spencer, now a special education teacher in St. Louis recalled assisting Detective Grimes in the Bunch murder investigation. He recalled that Paul Smith was questioned by officers three times at ninth district. Smith was never struck, beaten, or threatened, nor were his family and friends. He was fed regularly and did not ask to see anybody. He saw Smith sign the statement taken from him by Mr. Sumner. No promises were made with respect to leniency. Neither he nor Detective Grimes read the statement to Smith. "I assume that he read it. He signed it." Smith did not ask anyone to read the statement to him and he never advised anyone he could not read the statement.

Paul Smith's version of the facts surrounding his statement follows. He recalled his arrest on June 19, 1955, by Officers Mucherson and Kidd after which he was taken to ninth district. He was questioned that evening about seven o'clock. He acknowledged his signature on the statement taken June 23, and signed the following morning. He claimed a request to use the telephone to call his parents and denied he was advised of his rights with respect to making a statement and its use against him. He did not have a lawyer and did not ask for one. The statement was not read to him and he stated he could not read or write then or now. He did not recall affixing his initials throughout the statement; and, when he signed it, he did not know what he was signing.

He admitted he did not tell the officers he could not read and that he did not ask anyone to read the statement to him. He also admitted the lack of threats, abuse, and promises; and, finally: "Now, you said, Mr. Smith, that Mr. Sumner didn't threaten you and the police officers didn't threaten you or promise you anything, or Mr. Sumner didn't promise you anything, so was the statement, Mr. Smith, made of your own free will, the one you gave to Mr. Sumner? A. I believe so."

He maintained that he did not know which of the two statements he was signing, but the only difference between his prior oral statement and the signed statement was "in the way that I didn't know anything when I was arrested, I didn't know anything about Lee Bunch."

Ruth Mary Ray, older sister of Paul Smith, stated her brother could not read

or write. He went to public school through the fourth grade, and she acknowledged that she was reading when in the fourth grade.

From the trial transcript, the following appears in the testimony of Officer Grimes with respect to what transpired at the time Paul Smith signed his confession:

"Did you read the statement to him? A Did I read the statement to him? Q Yes. A Yes. Q You read it to him? A I did, and Paul Smith read it himself, we read it together for the purpose of correcting mistakes. Q My question was, did you read it to him? A No, I don't think that I read it to him and asked him to sign it—I think Paul Smith read the statement for the purpose of correcting— I know Paul Smith read the statement for the purpose of correcting mistakes and we asked him to point out whatever mistakes were on it, and for him to correct them by initialing. Q So you didn't read it to him? A I read a copy of the statement— not to him; I read it for my personal information.

"Q Did Spencer read it to him? A Spencer read a copy of the statement, but not to the prisoner.

"Q Isn't it a fact, Sergeant, that you read that statement to Paul Smith? A No sir, it is not a fact that I read it to him. Smith was given a copy of this thing to read, just as we read one."

And in the trial testimony of Officer Spencer appears the following:

"After this statement had been typewritten, and after you received it, was it given to the defendant in your presence, and him given an opportunity to read it over and make corrections? A Yes, it was.

"THE COURT: Did you see the defendant read the statement over and make the corrections in this statement? THE WITNESS: The statement was given to the defendant. THE COURT: And he made the corrections? THE WITNESS:

It was read to him and the corrections were pointed out to him.

\* \* \* \* \* \*

"Q Now, who read the statement to Paul Smith at the time, you or Grimes? A I didn't read it to him. Q Then Grimes read it to him, is that correct? A I don't recall; but I know I didn't read it to him. Q You know you didn't read it to him? A Yes. Q You know the statement was read to him? A Yes. Q And the only two in the room with him were you and Grimes? A Yes. Q If you didn't read it to him, it must have been Grimes, is that correct? A Yes. Q And then he signed it; there was no one else in the room? A I don't recall anyone else being in the room but the three of us."

And in the trial testimony of Paul Smith appears the following:

"Q Who read the statement to you, Paul? A Spencer. Q Spencer read the statement to you? A Spencer read it to me? A Could it have been Grimes? A Yes sir. That is who it was, Fred Grimes. Q Now, Paul, I believe that this 'P.S.' is in your writing, is that right? A Yes. Q Now, will you tell the jury how you affixed the 'P.S.' on there? A Well, when Fred Grimes was reading the statement to me, he would put his finger there and he said, 'Put your initials where ever I stop my finger', and he stopped his finger right there, and I would put 'P.S.' there.

"Q Now, Paul, did you ever read this statement? A No sir. Q Then you don't know, as a matter of fact, if the statement that you made at the Circuit Attorney's Office is this instrument that you signed, do you? A Yes, sir, I signed that. Q How much education have you had, Paul? A I would say about fourth grade."

By memorandum opinion the trial court demonstrated its thorough consideration of the foregoing evidence. Pertinent parts of that opinion follow:

"There is evidence to show that movant had a minimal education and is unable to

read and write. Movant also testified that, while being held at the police station, police officers refused him permission to place a telephone call to his mother prior to the time he signed his confession. It further is indicated that the confession in question was not read to him after it was transcribed and prepared. * * * A former assistant circuit attorney, who then interrogated movant, testified that he informed movant he was not required to make a statement and any he made could be used against him. This witness further stated that he addressed questions to movant with reference to threats or promises. The evidence further reveals that two police officers were in attendance when movant was interrogated by the as-assistant circuit attorney. Evidently, the written confession was not completed by the court reporter on the day in question and movant was returned by the police officers on the next day when he signed it. * * * Movant stated he then signed the confession but was unable to read it and did not understand the contents thereof. The confession in question was recorded in the office of the Circuit Attorney and not in a police station. The questions were there propounded by an assistant, who conveyed information concerning the situation to defendant, with a court reporter in attendant. The assistant was a member of the legal profession and now is a practicing lawyer who possesses a good reputation. Thereafter, and, as a witness on his own behalf during trial, defendant admitted that the statement was read to him, and he signed it. Granting defendant was illiterate, this would indicate that defendant was apprised of the events which then and there transpired and realized a statement was being recorded. As defendant supplied the answer to each question which was propounded to him and there recorded, it is apparent that he comprehended the import of same. There is nothing to reveal compulsion or misrepresentation. State v. Glenn, Mo., 429 S.W.2d 225; State v. Stidham, Mo., 449 S.W.2d 634."

Also preliminary to its denial of relief, the court made the following pertinent findings:

"3. That the confession was compiled from information supplied by defendant and that no compulsion or misrepresentation was employed to secure the same.

"4. That, upon a consideration of the events which then and there transpired, defendant realized that a statement was being secured from him and being recorded.

"5. That the confession was read to defendant and that defendant was apprised of the contents thereof.

"6. That this Court finds, and enters a finding, that the confession (State's Exhibit E) was voluntary on the part of defendant and given of his own free will and that defendant possessed sufficient intelligence to understand the import of same.

 *   *   *   *   *   *

"9. That defendant's rights were not violated or infringed upon in any respect and his contentions are without merit."

Appellant contends the court erred in finding that the confession was voluntary "because under the law and the facts it was involuntary"; that his right against self-incrimination was violated by admission of such confession in his trial, State v. Ussery, supra; and that the court's finding was erroneous, in particular, "because the court based such a finding on the erroneous finding that the alleged confession was read to appellant before signature."

Appellant states that if the statement was involuntary, then he has been deprived of his liberty without due process and his sentence must be set aside. Conversely, if the statement was properly found voluntarily given, then his constitutional rights have not been violated and the judgment of conviction must stand and the judgment denying relief in this proceeding must be affirmed.

Appellant recognizes that this case was tried prior to the effect of Miranda v.

Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and, accordingly, the test of voluntariness of his confession is "whether the totality of circumstances deprived the defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed." State v. Smith, Mo., 415 S.W.2d 748, 750[1].

Appellant asserts that the totality of circumstances which rendered his confession involuntary consisted of: (1) he was illiterate without education beyond the fourth grade; (2) he was held incommunicado for four consecutive days; (3) he was questioned intermittently and regularly for four days; (4) his first statement was refused; (5) his request to call his parents was refused; (6) he was not advised of his rights; (7) his statement was not read to him.

There are numerous difficulties in this argument. The court's memorandum demonstrates recognition of movant's short-term education and low level of reading ability, and the conflicting evidence with respect to his alleged refusal of use of the telephone, and whether the statement was read to movant prior to his signing it. The evidence does not demonstrate, without question, that movant was actually held incommunicado, that he was questioned or "grilled" in a manner to overbear his will, or that his first statement was refused. There is evidence showing that movant was advised of his rights; and, from his own lips, that the statement was read to him, that he initialed corrections to it in the process, and that he "believed," in fact, that the statement was made of his own free will. Additionally, the statement shows answers in movant's own words that demonstrate a fair degree of understanding and comprehension of what he was doing and the consequences of what he was doing.

With the case in this posture, it cannot be said with assurance that the trial court was required to exclude movant's confession. The question of voluntariness presented an issue of fact, resolution of which turned on credibility of the witnesses. The situation of the trial court to fairly and accurately appraise the evidence is not and could not in sincerity be challenged. It is not the function of this court to substitute a judgment for that of the trier of the facts. On this record, it cannot be said that movant's confession was involuntary as a matter of law; and, as a consequence, it cannot be said that the 'findings and judgment in denial of relief on that ground are "clearly erroneous." Criminal Rule 27.26, supra; Howard v. Swenson, 8 Cir., 404 F.2d 469; and for cases in point on facts and result, see Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; State v. Glenn, Mo., 429 S.W.2d 225.

Appellant's citations are readily distinguished: In Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192, the suspect was questioned continuously over a weekend without rest and under blinding light; in Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, the suspect was a schizophrenic highly subject to suggestion, removed to state prison and subjected to extensive interrogation to which his lawyer was denied admission; and in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, the suspect was mentally defective, questioned over a 4-day period, placed in a wire cage, and subjected to pressures from wife and family.

Judgment affirmed.

•

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., SEILER, J., and SMITH, Special Judge, concur.

BARDGETT, J., not sitting.